**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NS:MSM
F. #2017R01658

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 6, 2018

By ECF

The Honorable Carol B. Amon
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Anthony Grado
Criminal Docket No. 17-559 (S-1) (CBA)

Dear Judge Amon:

The government respectfully submits this letter in anticipation of sentencing in the above-captioned case, which is scheduled for August 15, 2018 at 10:00 a.m. For the reasons set forth below, the government respectfully requests that the Court impose a term of imprisonment in excess of 180 months.

## Background

The defendant, a long-time, inducted member of the Luchese organized crime family of La Cosa Nostra, ran a sophisticated scheme that illegally distributed large quantities of oxycodone and used threats of violence and his membership in the Luchese family to ensure his control over the operation.

From approximately September 2011 to approximately June 2013, the defendant worked with a doctor (the "Doctor"), Colombo organized crime family associate Lawrence ("Larry") Tranese, and others to distribute medications containing oxycodone that they obtained via prescriptions written under the Doctor's authority. Presentence Investigation Report ("PSR") ¶ 3. The defendant and his coconspirators typically would obtain the oxycodone through fraudulent prescriptions in one of two ways. In some cases, the defendant, Tranese and other coconspirators would provide the Doctor with the names of people for whom the Doctor should write prescriptions. The Doctor then would write

prescriptions in those names, usually without conducting a physical examination. The defendant, Tranese and others would then fill the prescriptions and sell the pills. Id.

In other cases, the defendant would hold the Doctor's prescription pads himself and either would meet the Doctor so that the Doctor could write fraudulent prescriptions at the defendant's direction or the defendant would complete the prescriptions himself and advise the Doctor of the details so that the Doctor could verify the prescription if a pharmacist called to do so. Id. ¶¶ 3, 5-6. For example, in one of numerous intercepted calls (attached as Exhibit A) demonstrating this aspect of the scheme, the Doctor called the defendant and the following conversation occurred:

GRADO: Hello?

Doctor: Ant?

GRADO: Why are you calling me on this phone?

Doctor: What phone should I call you on?

GRADO: It don't matter. Listen, you might get a call for Jose.

Doctor: Alright. Let me ask you a quick question, [unintelligible] I got my mom over here but my phone battery is low. I don't know. See, this is why it's unorganized. I got a call from Eve and I don't know if it's yours, I told the lady [unintelligible].

GRADO: No. Eve, Eve is for, for, what do you call it? The guy. The guy. What do you call it? Alexandra.

Doctor: No, [Male-1]?

GRADO: Yeah, that's it. That's it. Did you okay it?

Doctor: No. I didn't know who it was [unintelligible], it was, one of those, other people's papers.

GRADO: That's why I wanted to talk to you today. You blew another one.

Doctor: No, no, no. I told her, "I went to court to fight my wife. I'm gonna call my secretary to pull the chart out." And how many is it for, and what's [unintelligible]? What's the tab? How many is it for?

GRADO: 150.

Doctor: Okay. And oxy, right?

GRADO: Yeah.

Doctor: Alright. I'll call right now and tell her I spoke to my secretary and that's what it is.

GRADO: Alright.

Doctor: That's yours then, right?

GRADO: Yes.

Doctor: Alright.

GRADO: And, Jose might be calling.

Doctor: What?

GRADO: And, Jose.

Doctor: They didn't call yet about Jose.

GRADO: All right but they do, if they do call, okay that.

Doctor: Well, him I know. Him I know.

GRADO: Are you coming to my house tonight? But that's it, they might ask you the date, and the date was for yesterday, for today.

Doctor: Today?

GRADO: It was for yesterday the date, the 15th or the 16th. 15th I think.

In this conversation, the defendant asked the Doctor if he had approved a prescription that the defendant had arranged without the Doctor's knowledge ("Did you ok it?") and the defendant admonished the Doctor for not approving it, as had clearly occurred with other prescriptions the defendant filled under the Doctor's authority ("You blew another one."). The Doctor then asked the defendant for the quantity ("And how many is it for, and what's [unintelligible]? What's the tab? How many is it for?") and drug ("And oxy, right?")

of the prescription that the defendant had created using the Doctor's authority. The defendant informed the Doctor of what the defendant had "prescribed." The defendant then informed the Doctor that he might receive another call regarding "Jose" and that the Doctor should approve that prescription as well. Id. ¶¶ 5-6.

On at least one occasion, on November 5, 2012, the defendant directed the Doctor to the "office" of a woman to write fraudulent prescriptions. During the intercepted call (attached as Exhibit B), the defendant told the Doctor to go the location to "be a real doctor again" and explained that the woman had between 60 and 80 patients who needed "physicals," that "all you gotta do is check their heart beats, check their feet, check their bullshit, and sign off on them" and that the Doctor would earn "$40 a head." The Doctor, obviously unaware that he would be working in this new "clinic," asked, "When?" and the defendant replied, "Starting today. Get over here now . . . Act like a doctor, dress like a doctor, and get on your fucking A-game." Id. ¶ 12.

In total, from September 2011 to June 2013, 1,882 prescriptions totaling more than 270,000 pills for medications containing oxycodone were prescribed using the Doctor's authority. Virtually all of those prescriptions were part of the defendant's illegitimate scheme. Id. ¶ 20.

As part of the scheme, the defendant organized the rental and renovation of a medical office for the Doctor to use in furtherance of the defendant's oxycodone distribution conspiracy. Id. The defendant arranged for an unindicted coconspirator, who is now deceased, to manage the office. Id.

The defendant controlled the oxycodone distribution scheme through threats of violence and his membership in the Luchese organized crime family. In one consensual recording of a conversation among a confidential source ("CS"), the Doctor, and the defendant (excerpts attached as Exhibits C-1 and C-2), the defendant told the Doctor that he would make the Doctor write "a thousand scripts [prescriptions] a day and fucking feed you to the fucking lions" if the Doctor "fuck[ed] around" by writing prescriptions without the defendant's approval. In the same conversation, the defendant also told the Doctor that if the Doctor's newly ordered prescription pads "go in anybody's hands [other than the defendant's], I'll put a bullet right in your head." Id. ¶ 17. On at least one occasion, the defendant brandished a gun at the Doctor in a threatening manner to reiterate to the Doctor that the Doctor and his prescription pads were under the defendant's control. On another occasion, while the defendant, the Doctor and others were present together inside the office that the defendant had established for the Doctor, one of the defendant's relatives stabbed the Doctor after the defendant had learned that the Doctor had hidden his prescription pads from the defendant. Id.

In addition, at one point during the conspiracy, the defendant and Tranese had a dispute about who would control access to the Doctor's prescription pads, and therefore control access to the supply of oxycodone. The defendant and Tranese, who was an associate of the Colombo organized crime family, arranged a "sit down" between a member of the Colombo family and a member of the Luchese family to resolve the dispute. After the

organized crime sit down, the defendant and Tranese continued to work together to distribute oxycodone. Id. ¶ 16.

Discussion

The government respectfully submits that, in this case, a sentence in excess of 180 months' imprisonment is appropriate, in light of all relevant sentencing factors.

## I. Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 125 S. Ct. 738, 764-65 (2005). However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted). Those statutory factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed [] (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant[.]" 18 U.S.C. § 3553(a)(2).

## II. The Guidelines Range of Imprisonment

The Probation Department determined that:

- The Total Offense Level (including a one-point reduction for a global disposition before April 5, 2018) is 42 (PSR ¶¶ 36-41 & n.1);
- The defendant's criminal history category is VI (Id. ¶¶ 43-57); and
- The resulting Guidelines range of imprisonment is 360 months to life. Id. ¶ 41 n.1.

This estimate differs from the government's non-binding estimate set forth in the plea agreement in that (1) the Probation Department included a two-point firearm enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) that was not included in the plea agreement and (2) the Probation Department determined that the defendant is in criminal history category VI instead of criminal history category IV as set forth in the plea agreement. The government agrees that the Guidelines calculation set forth in the PSR is correct, but agrees to proceed using the Guidelines calculation set forth in the plea agreement, which is more favorable to the defendant.[1] In this case, the difference is ultimately immaterial as the Guidelines range of imprisonment under either calculation is 360 months to life.

## III. The Appropriate Sentence

The government respectfully submits that a sentence in excess of 180 months' imprisonment is appropriate in light of all the relevant sentencing factors, particularly the nature and circumstances of the instant offense, the defendant's history and characteristics, the need to protect the public from the defendant, and the need to deter the defendant and others like him.

The nature, circumstances and the seriousness of the defendant's crime weigh heavily in favor of a stringent sentence. For years, the defendant ran a sophisticated scheme that distributed large quantities of oxycodone, one of a class of drugs that has been ravaging communities around the country. According to the Centers for Disease Control and Prevention ("CDC"), "[d]eaths from prescription opioids—drugs like oxycodone, hydrocodone, and methadone—have more than quintupled since 1999."[2] Opioids were

[1] The plea agreement also set forth a "grouping" analysis including the Hobbs Act extortion and Hobbs Act extortion conspiracy charged in Counts Three and Four of the Superseding Indictment as "relevant conduct" for the instant offense. The defendant reserved the right to challenge inclusion of those acts as "relevant conduct" under the Guidelines. The PSR did not include that conduct as "relevant conduct" in its Guidelines calculation. The government notes, as estimated in the plea agreement, that inclusion of the extortion and extortion conspiracy as "relevant conduct" would have had no effect on the Guidelines in this case.

[2] CDC, Understanding the Epidemic, https://www.cdc.gov/drugoverdose/epidemic/index.html (last visited August 6, 2018).

involved in "42,249 deaths in 2016.[3] Staten Island, one of the areas in which the defendant's conspiracy operated, has been hit particularly hard by the opioid epidemic.[4]

The defendant's scheme resulted in 1,882 prescriptions for more than 270,000 pills containing at least 4,478 grams of oxycodone being illegally distributed throughout the community. To ensure maximum distribution of the drug and maximum profits for himself, the defendant rented and renovated an office from which the Doctor could prescribe the pills and planned to install a coconspirator as the office's manager. He personally held the Doctor's prescription pads in order to control the supply.

Worse yet, the defendant used threats of violence and his membership in the Luchese crime family to maintain control over the scheme and the supply of oxycodone. As set forth above, the defendant threatened to make the Doctor write "a thousand scripts [prescriptions] a day and fucking feed you to the fucking lions" if the Doctor "fuck[ed] around" by writing prescriptions without the defendant's approval. In the same conversation, the defendant also told that Doctor that if the Doctor's newly ordered prescription pads "go in anybody's hands [other than the defendant's], I'll put a bullet right in your head." PSR ¶ 17. The defendant also threatened the Doctor with a gun in order to maintain control over the lucrative prescription pads and the defendant's relative stabbed the Doctor in the defendant's presence after the defendant learned that the Doctor had tried to hide newly-ordered prescription pads from the defendant. Id. When the defendant's control over the Doctor's prescription pads came into dispute, he used his membership in the Luchese crime family to resolve it, calling for a "sit down" where more senior members of the Luchese and Colombo crime families resolved the dispute in his favor. Id. ¶ 16.

The defendant's history and characteristics also weigh heavily in favor of a stringent sentence. As noted above, the defendant is a member of the Luchese crime family, a violent criminal organization, and has been associated with the family since at least the time of his 1995 trial for extortionate extension of credit conspiracy. The defendant also has a lengthy criminal history, which includes convictions for gun and violence-related offenses. In 1992, the defendant was convicted of criminal possession of a weapon in the third degree and sentenced to one to three years' imprisonment. Id. ¶ 43. In 1994, the defendant was convicted in this Court of conspiracy to make an extortionate extension and collection of credit in connection with the Luchese crime family and sentenced to 63 months' imprisonment. Id. ¶ 44. From 2003 to the present, the defendant has convictions for a litany

---

[3] CDC, Opioid Overdose, https://www.cdc.gov/drugoverdose/index.html (last visited August 6, 2018).

[4] See Staten Island Needs Assessment: Opioid Addiction Prevention and Treatment Systems of Care (Spring 2017) at 10, available at http://rcda.nyc.gov/press/2017/2017-35.pdf ("Between 2015 and 2016, the number of overdose deaths [on Staten Island] rose from 69 to 116, representing a staggering growth of 68 percent. In 2016, Staten Island had the highest overdose rate in New York City and now it surpasses even the worst affected U.S. states, such as West Virginia and Utah.").

of misdemeanor offenses, demonstrating a continuing lack of respect for the law. Id. ¶¶ 45-55.

While the defendant's prior convictions weigh heavily in favor of a stringent sentence on their own, the defendant's history and characteristics, and the continuing nature of the danger he poses to the public, are further illuminated by his threatening conduct, which was captured on wiretapped phone calls.

For example, on August 6, 2012, the defendant was captured on a wiretap threatening to use force to collect money that another individual ("UM-1") owed to him. (Attached as Exhibit D.) A transcript of an excerpt of the call is below:

GRADO: Yo.

UM-1: What's up, Anth?

GRADO: What-you tell me, [UM-1]. What time am I seeing you?

UM-1: I had to work today, so I didn't get, I am gonna go tomorrow.

GRADO: Here we go again. You know, I, I, I can't do this no more, [UM-1]. Go borrow the fucking money. I need my money tonight. Go fucking borrow it, [UM-1's first name], I am dead serious. I got somebody waiting for me right now.

UM-1: Alright.

GRADO: And get my fucking bat and my fucking thing out of that car. Because I am fucking ready to fucking use it tonight.

UM-1: Alright, bye.

In another example, the next day, on August 7, 2012 (attached as Exhibit E), the defendant was intercepted threatening to "cripple" another unidentified individual and "break every fucking bone in his body," in order to set an "example." A transcript of a portion of the call is below:

UM-2: Hello.

GRADO: Yeah, what's doing?

UM-2: What's going on?

| | |
|---|---|
| GRADO: | Um, did that guy ever come to work today? |
| UM-2: | No. |
| GRADO: | He never called you? Did he call you? |
| UM-2: | He sent me a text message. |
| GRADO: | What'd he say? |
| UM-2: | He was like, "What's going on?" |
| GRADO: | [U/I] |
| UM-2: | He was calling the other kid over here, asking why he was yelling at him, this that and the other thing. |
| GRADO: | You gotta set him up for me, tell him nothing's wrong, come to work, and I am gonna fucking cripple him. And like I said, I don't give a fuck who's listening on this phone, that motherfucking. I am making him my example. I am gonna fucking break every fucking bone in his body, that dirty motherfucker. What else I gotta ask you? I am so crazy about this last night that I can't even fucking, that I, I, I am stuttering, I am pacing. I had to take sleeping pills, I went to bed four o'clock this morning. I got to [U/I]- I don't even- |

A stringent sentence is also needed to deter the defendant from continuing to commit crimes and to protect the community from the defendant. In 1996, the defendant was sentenced to sixty-three months' imprisonment for participating with other members of the Luchese crime family in a conspiracy to make extortionate extensions of credit and to use extortionate means to collect those loans. As the intercepted calls above make clear, that sentence was not a sufficient deterrent to prevent the defendant from continuing to use threats of violence against others. Nearly sixteen years later, the defendant was still using threats of violence to coerce people, threatening to "get [his] fucking bat and [his] fucking thing out of that car. Because [he was] fucking ready to fucking use it tonight" if he did not get paid and telling another individual that he would make an "example" out of a person by "fucking break[ing] every fucking bone in his body, that dirty motherfucker." These threats are, of course, in addition to his threat to "feed" the Doctor to the "lions" and "put a bullet right in [the Doctor's] head," threats made credible by the defendant's brandishing of a gun in front of the Doctor.

Finally, a sentence in excess of 180 months would also send a message to others who engage in the distribution of dangerous opioids like oxycodone, which are having

a significant negative impact on our community and those who participate in crimes as members of La Cosa Nostra.

* * *

The defendant argues that a sentence of 98 months' imprisonment—an approximate 73% variance below the low end of the Guidelines—is appropriate principally because (1) a longer period of incarceration would adversely affect his family, including his elderly parents and his daughter; (2) he has medical needs that he believes the Metropolitan Correctional Center ("MCC") is unable to meet; and (3) he has accepted responsibility and rehabilitated himself through drug treatment. See Def. Mem. at 3-5, 7-8, 10-12, 20-21. None of these arguments justify such a lenient sentence.

It is, of course, proper for the Court to consider the impact of the defendant's incarceration on his family. In this case, however, it should be given little weight in comparison to the factors described above because the defendant's family, including his father and his ex-wife, was involved in the defendant's oxycodone distribution scheme.

Paragraph 14 of the PSR describes a December 14, 2012 recorded phone call between the defendant and his father (described in the PSR as an unindicted coconspirator),[5] in which the defendant instructed his father, who was waiting outside of the defendant's apartment, to get some blank prescription sheets to give to the Doctor but to hide the remaining prescriptions from him. PSR ¶¶ 14-15. During the call (attached as Exhibit F), the defendant instructed his father:

> "go in the garage, and take four off the pad…Take four. The doctor's going to meet you right in front of the building. Give him four, four sheets. And, put the rest of the pads—you know the stuff in front of my car?. . . Don't let him see. Just, just put the pads, the pads underneath that stuff in the garage. And, just give the doctor four sheets."

The defendant's father replied, "Here he is now, the pain in the ass," to which the defendant replied, "Just give him four. That's all he's getting. And, put the rest in the thing. I'll take care of you when I see you." The defendant also wrote prescriptions for his father under the Doctor's authority and, on another intercepted call (attached as Exhibit G), the defendant informed the Doctor that the defendant had written a prescription for his father, so that the Doctor could verify it:

> GRADO: I said, my father might go today, just in case, all right?

[5] During the call, the defendant identifies the person with whom he is speaking as "Dad."

| | |
|---|---|
| Doctor: | Oh. Okay. They never call anymore though, right? Go to the same place, right? |
| GRADO: | Yeah. I'm just, no I'm just, I'm sending him somewhere else because he's going, he's um, he's gotta go away for a, for a job. He ain't gonna be around for another three weeks, so I might send him over there. But they- they don't call the other place neither. |
| Doctor: | Oh ask, all right- |
| GRADO: | I just want, I just want, you know- |
| Doctor: | Is he thirty days or no? He's a little early, you are saying, right? |
| GRADO: | Yeah, yeah, but so- |
| Doctor: | All right I got a lot though, all right no big deal. |
| GRADO: | Never with him but- |
| Doctor: | It's all right, it's okay. |
| GRADO: | No, I don't do that, not with him- |
| Doctor: | Well today he is, though, right? |
| GRADO: | Yeah, I- |
| Doctor: | All right, no, no big deal. Where's he going? Is he going to S [meaning the pharmacy on Avenue S]? |
| GRADO: | Yeah. |

Paragraph 12 of the PSR describes a call (also described above) in which the defendant tells the Doctor to go to a location in order to give "physicals" to between 60 and 80 "patients" and to be "a real doctor again." (Attached as Exhibit B.) The defendant also tells the Doctor that he would earn "$40 a head" and that he simply needed to perform a fake examination ("check their heart beats, check their feet, check their bullshit") and "sign off on them." PSR ¶ 12. The woman referred to in the PSR is Joann Tufaro, the defendant's ex-wife. During the call, the defendant can be heard in the background speaking to a woman he identifies as "Jo," asking her "how many people do you have?" and "how much per head?" On the call, the defendant then tells the Doctor to come to "my house, I got a fucking job for you to be a real doctor again" and states that "Joann, in her office" has a number of people coming that could result in $15,000 to $20,000 in profits for the conspiracy.

It is also proper for the Court to consider the defendant's medical condition. Again, however, this factor should be given little weight in this case. Even assuming the defendant's claims about the level of care at the MCC's are correct, the defendant is unlikely to spend much time there after he is sentenced. He is, instead, likely to be designated to a different facility, which likely will be able to address his seemingly routine conditions: diabetes, cellulitis, erythema (superficial reddening of the skin), hyperlipidemia (abnormally high concentration of fats in bloodstream), and the potentially more serious existence of a tumor in the defendant's abdomen.

Finally, the defendant argues that a 98-month sentence is appropriate because "there is reason to believe that [he] will change his path and his previous methodology" and he "accepts full responsibility for his actions." Def. Mem. at 10. In the face of overwhelming evidence, the defendant pled guilty to this offense, which shows some level of acceptance of responsibility. But the defendant's minimization of his criminal conduct demonstrates that he has not come to terms with what he did and undercuts the suggestion that he is seeking to change.

In the PSR, the defendant claims that his threats to the Doctor were to stop the Doctor from "writing 'scripts for kids.'" Id. ¶ 27. In his sentencing submission, the defendant claims that when he said he would feed the Doctor "to the lions," he was using "figurative language" that simply meant he would revert the Doctor back to the parasites," meaning the Doctor's addiction, "and release his [the defendnat's] helping hand." Def. Mem. at 9. In both statements, the defendant casts himself as a hero, providing support to others in need of his assistance.

These statements are lies. They are flatly contradicted by the defendant's recorded words and his actions, which show the defendant using threats of extreme violence to control the Doctor, the source of supply for the defendant's oxycodone distribution scheme. In the recording, the defendant threatened to "blow [the Doctor's] balls out over there if [the Doctor] fucks around," to "fucking make [the Doctor] do a thousand scripts a day and fucking feed [the Doctor] to the fucking lions, if [the Doctor] fuck[s] around."[6] See Exhibit C-1. The defendant made those threats to coerce the Doctor, who the defendant believed was giving other people, including Lawrence (Larry) Tranese, prescriptions at the same time that the defendant was spending money to build a fraudulent medical office for the scheme. The defendant threatened to "put a bullet right in [the Doctor's] head" and then to "go[] to Larry's head and . . . put[] a bullet in his head" and then to do the same with

---

[6] To state the obvious, if the defendant's threat to feed the defendant to the lions were simply a threat to "release his helping hand" in a way that would cause the Doctor to succumb to his addiction, it would make no sense for the defendant to threaten to first "make [the Doctor] do a thousand scripts a day" before threatening to "fucking feed [the Doctor] to the lions." As the recording makes clear, the defendant threatened to harm the Doctor if he did not stop taking actions that cut into the profitability of the defendant's oxycodone distribution business.

"Stephen and them" if "those scripts go in anybody's hands." See Exhibit C-2. He threatened extreme violence in order to maintain control of his lucrative oxycodone distribution scheme because "money keeps on coming out of [the defendant's] pocket." These threats were credible because the defendant had brandished a firearm and because of his membership in the Luchese crime family. In denying the plain meaning of these and other recorded conversations, including those discussed above, the defendant shows just how little he accepts responsibility for the serious crime that he has committed, how dangerous he is to the public, and further reveals how unlikely he is to be rehabilitated.

IV. Conclusion

For the reasons set forth above, the government respectfully asks the Court to impose a term of imprisonment in excess of 180 months.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By: /s/
Mathew S. Miller
Matthew Jacobs
Assistant U.S. Attorneys
(718) 254-6075/6401

cc: Clerk of the Court (CBA) (by ECF)
Jeremy Iandolo, Esq. (by ECF and email)
Michelle Murphy, U.S. Probation Officer (by email)