1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        17-CR-559(CBA)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5          -against-                    December 06, 2018
                                        12:30 p.m.
6   ANTHONY GRADO,

7          Defendant.

8   ------------------------------x

9           TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
              BEFORE THE HONORABLE CAROL B. AMON
10                UNITED STATES DISTRICT JUDGE

11  APPEARANCES

12  For the Government:        UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  MATTHEW MILLER, ESQ.
                                    MATTHEW JACBO, ESQ.
15                             Assistant United States Attorneys

16  For Mr. Tranese:           AIDALA BERTUNA & KAMINS P.C.
                               546 Fifth Avenue
17                             New York, New York 10036
                               BY:  ARTHUR L. AIDALA, ESQ.
18                                  MICHAEL JACCARINO, ESQ.

19  For Mr. Grado:             J. IANDOLO LAW P.C.
                               7621 13th Avenue
20                             Brooklyn, New York 11228
                               BY:  JEREMY IANDOLO, ESQ.
21
    Court Reporter:            Rivka Teich, CSR, RPR, RMR, FCRR
22                             Phone:  718-613-2268
                               Email:  RivkaTeich@gmail.com
23
    Proceedings recorded by mechanical stenography.  Transcript
24  produced by computer-aided transcription.

25

SENTENCING

1              (In open court.)

2              THE COURTROOM DEPUTY:  All Rise.  Criminal cause for

3      sentencing, 17-CR-559, U.S. versus Anthony Grado, and U.S.

4      versus Lawrence Tranese.

5              Counsel, state your appearances for the record.

6              MR. MILLER:  Good afternoon, your Honor, Mathew

7      Miller and Matthew Jacobs for the United States.  We're joined

8      by Probation Officer Jeremy Neiss.

9              MR. NEISS:  Good afternoon, your Honor.

10             MR. AIDALA:  Good afternoon, your Honor.  On behalf

11     of Mr. Tranese, Arthur Aidala.  And accompanying me from my

12     law firm is my partner Michael Jaccarino.

13             MR. IANDOLO:  Jeremy Iandolo on behalf of the

14     defendant, Anthony Grado.

15             THE COURT:  Good morning.  Everyone can be seated.

16             Before we begin, I have one question with respect to

17     Mr. Tranese.  There is an enhancement to his guideline range,

18     two points for use of violence.  It appears to me that that is

19     disputed.  Do we need a Fatico hearing on that?

20             MR. MILLER:  Your Honor, I can speak to that.

21     Before I do I'll note that we're joined by Special Agent

22     Chance Adam at counsel table from the FBI.

23             The enhancement is for either the use or the threat

24     of force.  The threat of force was stipulated to; the use was

25     contested.  The facts of use were contested.  We're not

SENTENCING

1   intending to proceed today on the actual use of force but are

2   relying on the stipulated implied threat, the threat of force.

3   So the guidelines range is unchanged.

4           THE COURT:  Where was that stipulated?

5           MR. MILLER:  In the plea agreement, your Honor,

6   paragraph two it sets forth the base offense level, plus the

7   use or threat of violence under 2D1.1B2.  And then further

8   down in the paragraph, the defendant stipulates to the above

9   guideline change, except reserves his right to dispute the

10  relevant conduct portion of it.

11          THE COURT:  Mr. Aidala, what I'm not sure what

12  you're disputing then.  I understood you to be disputing that

13  anyone was physically assaulted.

14          MR. AIDALA:  That's correct.

15          THE COURT:  I understood it to go past that.  It

16  says at page six, Larry vehemently denies threatening get that

17  especially with violence.  That seems to be to still be

18  disputed.  Do you have at plea agreement there I don't have a

19  copy?

20          MR. MILLER:  Yes, your Honor.

21          THE COURT:  So I don't know how to square those two

22  things.

23          MR. AIDALA:  Your Honor, I believe in terms of

24  background there were extensive conversations with the

25  Government about this particular area of the plea agreement.

SENTENCING

1    We do feel very strongly, and we made that clear, there was no

2    physical violence.  I believe what we agreed on was that the

3    Doctor may have perceived, due to circumstances, that there

4    was a threat.  But in terms of what the Court has experienced

5    in the Court's long, distinguished career, the threat of "I'm

6    going to put a bullet in your knee unless you do this," or,

7    "I'm going to hit with you a bat unless you do that," those

8    are not the type of threats we're referring to, eventually

9    when I'm allowed to address the Court.

10           There was an issue of the Doctor here not paying

11   rent, legitimate rent, to Mr. Tranese.  And so there may have

12   been some threats, if you don't pay the rent you're going to

13   have a problem.

14           I don't want the Court to believe it's the same

15   thing as dealing with, if you don't give me my money I'm going

16   to kill you or break your legs.  So it's a fine line, your

17   Honor, regarding the facts here.

18           I think what we were arguing, we didn't want to give

19   the Court the misrepresentation that they were the type of

20   threats that the Court normally hears about and deals with.

21           THE COURT:  The guideline says and this is -- so the

22   guideline says that you increase by two levels if the

23   defendant used violence or made a credible threat to use

24   violence.  So the Government is relying on the fact that he

25   made a credible threat to use violence.  You're not proceeding

SENTENCING

1    to prove that he slapped him, which is something that is said.

2              MR. MILLER:  That's right, your Honor.

3              THE COURT:  Your credible use of violence is based

4    on the quote of page three of your letter.

5              MR. MILLER:  That's right, your Honor.

6              THE COURT:  I'm still not sure, Mr. Aidala, where we

7    are, where we come out on this.  It seems to me that you're

8    challenging it.  Because the violence has to be in connection

9    with the crime, not in connection with paying rent.  And it

10   still seems to be challenged.

11             MR. MILLER:  Yes.

12             MR. AIDALA:  Yes, your Honor, the Court is correct.

13             Even on page three where there is that text message

14   the Government highlights that my client, two hours later

15   replies, I'm here why don't you come out so we can have a chat

16   and we'll both be on camera.  Meaning, if I was going to do

17   something to you there is cameras out here and we'll both be

18   on the camera together, so obviously I don't have a real

19   intention of doing something to you in a way that is going to

20   be so public.

21             THE COURT:  I think we have a dispute here.  I think

22   if you're saying there is a stipulation to it in the plea

23   agreement, and that's the basis of it then what is the

24   Government's position here?

25             MR. MILLER:  May I have a moment, your Honor?

1          THE COURT:  Yes.

2          MR. MILLER:  So, your Honor, I think that the

3  language in the text message on the bottom of page three, it's

4  evidence of not just the threat that comes after that but that

5  something had preceded that text message, that in the view of

6  the victim, was sufficiently threatening to force him to write

7  the things that he wrote.  So our position is that this text

8  message makes out and supports both the stipulation and the

9  enhancement under that provision of the guidelines.

10          THE COURT:  It's not clear to me that you

11  actually -- yes, I guess you -- I'm not sure you actually

12  challenged the guideline calculation that relied on this, did

13  you?  You challenged the fact that --

14          MR. AIDALA:  Your Honor --

15          THE COURT:  -- that he slapped him, but did you

16  challenge the guidelines?

17          MR. AIDALA:  I believe we have the ability to argue.

18  I guess the word that I would highlight for the Court would be

19  the word implied, it could be an implied threat as opposed to

20  an express threat.  In our conversations with the Government,

21  it was more focused on how the receiver of the information was

22  observing it and translating it as opposed to the intention of

23  Mr. Tranese.  What is most important to Mr. Tranese is that

24  the Court not have the wrong impression that there was any

25  physical contact, number one.  And the paragraph that the

SENTENCING

1   Government submits is a good example of kind of where the

2   defendant -- where the Doctor thought Mr. Tranese was coming

3   from.  In there he says, you want to threaten me, the threats

4   are going to end, et cetera, et cetera.  Obviously he's under

5   the impression that Mr. Tranese was threatening him, whether

6   or not Mr. Tranese was or was not threatening him, it's what

7   his own intentions were.

8          So I think the dead end that we reached with the

9   Government in trying to reach this agreement was that although

10  Mr. Tranese's intent may not have been to explicitly threaten

11  him, there must have been an implied threat because the Doctor

12  would not have made those statements had there not been some

13  sort of implied threat that another human being listening to

14  information would --

15         THE COURT:  The question is, was it your, was it the

16  defendant's intention either to imply a threat or make a

17  threat.  Because I don't know how that guideline application,

18  the plus two, is added if there is a denial that there was any

19  implied threat, how it's added as the result of an admission.

20  It may be that the Government can prove it, but I thought

21  according to the agreement it was stipulated to.

22         MR. MILLER:  I think that's right, your Honor.  I

23  don't think there is a dispute about the two points applying.

24         THE COURT:  There may not be -- when the witness is

25  dancing around.  You reached an agreement you're putting it in

SENTENCING

1   the Court's lap.  You're dancing around this.  If these two

2   points apply, if it was a part of the plea agreement, then the

3   defendant could do a couple of things, I suppose, which is not

4   challenge that the Government can prove it.  But I don't think

5   you can deny it and then say but it's okay to add the two

6   points.  I just have a little problem with how this is going

7   here.

8          MR. AIDALA:  Okay, your Honor, if I may.

9   Mr. Tranese never made an explicit threat.  Mr. Tranese would

10  accept responsibility for putting together a set of facts and

11  a set of words that came out of his mouth that a reasonable

12  person would imply as a threat.

13         THE COURT:  So would it be correct to say that

14  you're not challenging the fact that the Government can prove

15  that he made a threat here.

16         MR. AIDALA:  That would be correct.

17         THE COURT:  Which would add the two points, is that

18  perhaps the best way to analyze this, that you're not

19  challenging that the Government can make that out.

20         MR. AIDALA:  That's correct, your Honor.

21         THE COURT:  Okay.

22         MR. MILLER:  Thank you, your Honor.

23         THE COURT:  What I think is probably the most

24  expeditious way to proceed, is to assure that with respect to

25  both defendants we iron out the issue of what the guidelines

SENTENCING

1    are with respect to each defendant.  Then I'll proceed first

2    in terms of the actual sentencing with Mr. Grado and then with

3    Mr. Tranese.  To the extent that there is any issue about

4    guidelines that may potentially effect both, I want to make

5    that determination first.

6            Let me turn first to Mr. Grado.  Let me make a

7    couple of preliminary inquiries.  I want to be assured that I

8    have all the papers here.

9            I have a presentence report for Mr. Grado, an

10   addendum to the presentence report.  A letter dated August 6

11   from the Government.  A sentencing submission, a lengthy

12   sentencing memorandum, on Mr. Grado's behalf.  And then I have

13   what I guess is an addendum to that on November 20.

14           Counsel, are there any other documents that you

15   believe the Court should have in this record?

16           MR. IANDOLO:  No, your Honor.

17           THE COURT:  Does the Government believe there is

18   anything else --

19           MR. MILLER:  No, your Honor.

20           THE COURT:  -- should be in the record?

21           Let me ask Mr. Iandolo, have you reviewed the

22   presentence report and the addendum to the report with your

23   client?

24           MR. IANDOLO:  Yes, everything has been reviewed with

25   my client.

SENTENCING

1        THE COURT:  It's better if you stay seated, for the

2  microphones, it probably works better if you stay seated.

3        Mr. Grado, did you read your presentence report?

4        MR. GRADO:  Yes.

5        THE COURT:  Did you read the addendum to the report?

6        MR. GRADO:  Yes.

7        THE COURT:  Did you have an adequate opportunity to

8  discuss the contents of that report with your counsel?

9        MR. GRADO:  Yes.

10        THE COURT:  Are you satisfied to have him represent

11  you?

12        MR. GRADO:  Yes.

13        THE COURT:  Mr. Iandolo, are there any challenges to

14  the information contained in the report?

15        MR. IANDOLO:  No, your Honor.

16        THE COURT:  Do you agree with the guideline

17  calculation that's set forth in the report.

18        MR. IANDOLO:  They were stipulated to by the

19  Government and myself.

20        THE COURT:  I think there is a difference between

21  the report and -- unless it was corrected in an addendum.

22        MR. MILLER:  I think there is a difference between

23  the guideline calculation in the report and in the plea

24  agreement.  As we noted in our sentencing submission, we are

25  agreeing to proceed.  We believe that the Probation

SENTENCING

1  Department's calculations are correct, but agreeing to proceed

2  under the more favorable calculations in the plea agreement.

3          THE COURT:  In your plea agreement letter you found

4  that the adjusted offense level was 43, but a criminal history

5  category of four, right, that's what the plea agreement was?

6          MR. MILLER:  That's right, your Honor.

7          THE COURT:  I wasn't clear on how many levels did

8  you give off for acceptance for responsibility, was it three

9  or?

10         MR. MILLER:  Normal, three, your Honor.

11         THE COURT:  The regular three.

12         MR. MILLER:  Yes.

13         THE COURT:  So then your guideline range that you

14  agreed to was 40 with a criminal history category of four,

15  which was 360 to life.

16         MR. MILLER:  Plus an additional point off for global

17  disposition, so 39 and four, which was also 360 to life.

18         THE COURT:  Was the extra point off also applicable

19  to Mr. Tranese's case?

20         MR. MILLER:  Yes.

21         THE COURT:  So a global disposition with two

22  defendants.

23         MR. MILLER:  Yes, your Honor.

24         THE COURT:  Okay.  So then you believe that the

25  guideline range should be 39, criminal history category four,

SENTENCING

1   which was 360 to life.

2              MR. MILLER:  Yes, your Honor.

3              THE COURT:  The probation report has criminal

4   history category -- just to go through it -- it's base offense

5   level 36, that's agreed to, correct, that's not something that

6   you challenged.

7              MR. MILLER:  Correct, your Honor.

8              THE COURT:  Then plus two for possessing the

9   firearm, that's not challenged, correct, counsel?

10             MR. IANDOLO:  Correct.

11             MR. MILLER:  Possessing the firearm is in dispute.

12             THE COURT:  I'm sorry?  Did the Government have that

13   in their --

14             MR. MILLER:  We did not have it in the plea

15   agreement; it was in the PSR.

16             THE COURT:  So you do dispute that?

17             MR. MILLER:  We are not seeking to have the firearm

18   enhancement included.  We think it is correct, but it was not

19   in the plea agreement so we're not seeking to proceed with

20   that.

21             THE COURT:  This is based on the allegation that he

22   pulled a firearm on the --

23             MR. MILLER:  Yes, your Honor.

24             THE COURT:  -- the doctor.

25             MR. MILLER:  Yes.

SENTENCING

1          THE COURT:  I know it's not in the plea agreement,

2     but are you disputing that fact?

3          MR. IANDOLO:  Your Honor, it wasn't on our original

4     agreement so we are disputing it.  But we're under the same

5     impression that it should not be -- it's not relevant.  It

6     should not be deemed relevant conduct here.

7          THE COURT:  The Government didn't put it in there,

8     why?  Because you didn't notice it?

9          MR. MILLER:  A mistake, your Honor.

10         THE COURT:  But you told me earlier you weren't

11    challenging any of the facts in the report, right?

12         MR. IANDOLO:  Your Honor, we went through and if we

13    over-looked it, we went through it on multiple occasions.

14         THE COURT:  I'm sorry, what?

15         MR. IANDOLO:  My client and myself went over this on

16    multiple occasions.  We looked at bottom number.  The bottom

17    number, it was never -- I was having the sentencing submission

18    that I gave you as an exhibit, but it wasn't part of our

19    original agreement.

20         THE COURT:  But you're not disputing the facts in

21    the report.

22         MR. IANDOLO:  The facts are the facts.  And the

23    facts do layout so, yes, there is no disputing.

24         THE COURT:  With the extra point off it would be,

25    according to probation's calculations, if they gave that extra

SENTENCING

1   point off for the global plea, it would be 42, criminal

2   history category six, correct?

3           MR. MILLER:  Yes, your Honor.

4           THE COURT:  Which also is 360 to life, right?

5           MR. MILLER:  Yes, your Honor.

6           THE COURT:  So it's the same.

7           MR. MILLER:  It's the same.

8           THE COURT:  So you believe that I should find that

9   the guideline range here, whether I invoke criminal history

10  category four or six, or whether it's 40 or 42, it results in

11  the same guideline range, 360 to life, correct?

12          MR. MILLER:  Yes.  And I think I just need to

13  confirm it, even if it's 39, which would be the 40 minus the

14  global point, 39 and four, which is most favorable to the

15  defendant, I believe is also 360.

16          THE COURT:  The only thing, though -- let me do the

17  math.

18          What I understand the defendant to be disputing in

19  the Probation Department's calculation is the two points and

20  the criminal history category, correct?  That would be

21  according to your agreement?

22          MR. MILLER:  That's right.

23          THE COURT:  So according to the agreement that you

24  reached with the defendant, your agreement would have been 39

25  and four; is that right?

SENTENCING

1          MR. MILLER:  That's correct, your Honor.

2          THE COURT:  And 39 and four is 360 to life.  And if

3    the probation, assuming their calculations are correct, and

4    they also give the extra point that you agreed to, that would

5    be 42 and six.

6          MR. MILLER:  Yes, your Honor.

7          THE COURT:  Which is also 360 to life, correct?

8          MR. MILLER:  Correct.

9          THE COURT:  Other than the fact that the Government

10   agreed to a criminal history category four or mentioned that

11   in the plea agreement, is there any other basis that you're

12   disputing the criminal history category six?

13         MR. IANDOLO:  Your Honor, there was some things that

14   I believe I went through with Mr. Jacobs on a few occasions

15   that were outside the ten or 15-year scope, depending on the

16   calculations.  I don't have those numbers in front of me at

17   this time what is outside the scope or not to put them in

18   category four and not a six.  Obviously, the time frame on

19   either of the two are the same, 360 to life, but obviously we

20   want what was agreed to as the criminal history category, so

21   your Honor would be able to see that Mr. Grado is not as bad

22   as his criminal history category makes him.

23         THE COURT:  What is wrong about what the probation

24   office did with regard to the criminal history category?

25         MR. IANDOLO:  Two of the felonies are over 20 years

SENTENCING

1    old.  I think that's where the number came from .

2              THE COURT:  Over how long?

3              MR. IANDOLO:  Over 20 years old.

4              THE COURT:  Why isn't paragraph 44 too old?  Is it

5    because of the violations?

6              MR. IANDOLO:  He was released 17 years ago on it.

7              MR. MILLER:  It's from the time of the crime, your

8    Honor, so the offenses were back in 2012.

9              THE COURT:  From the time of what?

10             MR. MILLER:  From the time, not the time of

11   sentencing but time of the offense.  He's in custody.

12             THE COURT:  Time of the offense would have been an

13   earlier date.  What do you mean?

14             MR. MILLER:  It is properly included.

15             THE COURT:  I'm not following you.

16             MR. MILLER:  It was in 1999, 15 years after 1999

17   when he was released from custody.

18             THE COURT:  So you're counting it from the date he

19   was released from custody.

20             MR. MILLER:  Which is what is appropriate under the

21   guidelines.

22             THE COURT:  Not the date he committed the crime.

23             MR. MILLER:  The instant offense was 2012, 15 years

24   before that.

25             THE COURT:  I thought you were talking about the

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SENTENCING

1    date he committed the crime.

2            MR. MILLER:  I'm sorry.

3            THE COURT:  I don't see there is any -- I have to

4    find a guideline range here.  I think it's accurately

5    calculated in the presentence report at a 42, criminal history

6    category six, which is 360 to life.  I note that it doesn't

7    really make a difference under the calculations because even

8    39 and four, which is the most favorable to the defendant,

9    produces the same guideline range.  The Government takes the

10   position here -- you're not taking the position that a 30-year

11   sentence, or rather I should say the guideline sentence, is

12   appropriate here, correct?

13           MR. MILLER:  No.  We're arguing for a sentence below

14   the guidelines.

15           THE COURT:  Okay.  Let me turn to Mr. Tranese's

16   guideline range.  First.

17           Of all, let me assure Mr. Aidala, that I have all

18   the papers that I should have for Mr. Tranese.  I have a

19   presentence report, I believe there is an addendum to that

20   report as well.  I have a sentencing submission dated July 12

21   and a letter from the Government dated August 6.

22           Are there any documents that I should have?

23           MR. AIDALA:  Your Honor, we submitted a letter on

24   July 12 to probation regarding our objections to the

25   presentence report.

SENTENCING

1           THE COURT:  Okay.

2           MR. AIDALA:  I don't know if it's extremely relevant

3    for today, but it does --

4           THE COURT:  July 10?

5           MR. AIDALA:  Yes, your Honor.

6           THE COURT:  Now with respect to -- but, those are

7    the all the documents?

8           MR. AIDALA:  Yes.

9           THE COURT:  Does the Government agree to that?

10          MR. MILLER:  We submitted a response on July 13 to

11   their objections.

12          THE COURT:  I don't know that I have that, I don't

13   think that's necessarily --

14          MR. MILLER:  I'm happy to hand it up if your Honor

15   wants.

16          THE COURT:  Okay.  In this you say you're prepared

17   to prove that the defendant slapped the Doctor, but you're not

18   prepared to prove that now.

19          MR. MILLER:  Correct, your Honor.

20          THE COURT:  You agree that he should not have

21   obtained a managerial role.

22          MR. MILLER:  That's correct.

23          THE COURT:  Let me ask Mr. Aidala, have you read the

24   presentence report, the addendum report, and discussed them

25   with Mr. Tranese?

SENTENCING

1    MR. AIDALA:  Yes, your Honor.

2    THE COURT:  Are there any factual challenges to

3    materials in the presentence report that we haven't discussed?

4    I know you challenged the assault statement, but anything

5    other than that?

6    MR. AIDALA:  We challenged the assault statement

7    which is in paragraph 20.  Paragraph 23 addresses the

8    guidelines, the enhancement for his role.  And, your Honor,

9    paragraph 18 alludes to Mr. Tranese's organized crime ties.

10   We're objecting to that as well.

11   THE COURT:  Have you challenged that in the past?

12   MR. AIDALA:  I do not believe that that was in our

13   written submission.

14   It's on a letter to the Court, your Honor, I

15   apologize.  It's strongly worded in our letter to the Court.

16   It's not in our objection letter.

17   THE COURT:  Tell me where in your letter to the

18   Court; I want to make sure I've seen this.

19   MR. AIDALA:  Sure.

20   THE COURT:  You say that he -- you basically say he

21   wasn't an organized crime associate, that he was just friends

22   with this fellow Manny Lavuzo (ph).

23   MR. AIDALA:  Life-long, childhood friends, since

24   they were like nine years old.

25   THE COURT:  Are you objecting to the fact that Grado

SENTENCING

1   and Tranese arranged a sit down?

2              MR. AIDALA:  We're objecting to the fact that the

3   sit down was arranged by Mr. Tranese, yes.  We're not --

4              THE COURT:  It says both of them.  It says Grado and

5   Tranese arranged a sit down, a meeting between a member of the

6   Colombia organized crime family, that I guess is this guy

7   Manny.

8              MR. AIDALA:  Yes, your Honor.  We don't have any

9   knowledge whether that meeting did take place or did not take

10  place.  It very well may have taken place, but it was not done

11  so at the behest of Mr. Tranese.  No one is alleging that

12  Mr. Tranese was at that meeting.

13             THE COURT:  You're not challenging that there could

14  have been a meeting which was to resolve the dispute over --

15             MR. AIDALA:  We have no knowledge.

16             THE COURT:  -- the pads?

17             MR. AIDALA:  We have no knowledge of that one way or

18  the other.

19             THE COURT:  What is the Government's position on

20  this?

21             MR. MILLER:  Our position is the meeting occurred.

22  It was to resolve the dispute about this.

23             THE COURT:  Were the defendants there?

24             MR. MILLER:  I don't know if Mr. Tranese was there.

25  But it was on his behalf with Manny Lavuzo.

SENTENCING

1        THE COURT:  Acting on his behalf.

2        MR. MILLER:  Yes.

3        MR. AIDALA:  If I may, someone can do something on

4   someone's behalf but not because they asked them to do it, but

5   just because they stepped in and took matters into their own

6   hands.

7        THE COURT:  You mean like a really good friend.

8        MR. AIDALA:  They've know each other since they are

9   nine years old.

10       MR. MILLER:  Your Honor, as we pointed out in our

11   sentencing letter, beginning on page seven, there is ample

12   evidence of the association between this member of the

13   Colombia family and Mr. Tranese in multiple different

14   instances.  And so to the extent there is a dispute about

15   whether he is an associate of the family or not, I think the

16   facts laid out in the letter certainly are enough to prove

17   that by a preponderance of the evidence.

18       MR. AIDALA:  They definitely know each other for a

19   very long time, close friends, definitely family friends since

20   childhood.  I'll address that at the appropriate time.

21       THE COURT:  What is your proof that he asked Lavuzo

22   to intervene in the dispute between him and -- is that on a

23   tape?

24       MR. MILLER:  One moment, your Honor.  Your Honor,

25   evidence that -- as I sit here today I don't have evidence

SENTENCING

1    that Mr. Tranese asked Mr. Lavuzo to sit down on behalf of

2    him; just that they are closely associated and that the sit

3    down occurred and it was resolved and that they continued to

4    work, he and Mr. Grado continued to work the conspiracy

5    together.  And against the background of how organized crime

6    disputes get resolved, which is more senior members --

7            THE COURT:  What was the dispute?

8            MR. MILLER:  There was a dispute between who would

9    control access to the Doctor's prescription pad.

10           THE COURT:  Between Mr. Tranese and Mr. Grado.

11           MR. MILLER:  Yes, your Honor.

12           THE COURT:  Then you have evidence that Mr. Lavuzo,

13   who is a member of the Colombia family, sat down to resolve

14   this with a member of the Lucchese family.

15           MR. MILLER:  Yes, your Honor.

16           THE COURT:  How was it resolved?

17           MR. MILLER:  It was resolved that Mr. Grado would

18   keep control of the pads, but then they worked together after.

19           THE COURT:  Do you agree, Mr.Aidala, that there was

20   a dispute?

21           MR. AIDALA:  Your Honor, there may have been a

22   dispute between Mr. Grado and the Doctor in this case.  But as

23   we sit here today, Mr. Tranese says he didn't have any

24   disputes.

25           Once again, your Honor, we're not challenging

SENTENCING

1  whether this meeting took place and who was at the meeting.

2  He wasn't involved.  Mr. Tranese wasn't involved.  Both sides

3  are in agreement with that he wasn't present, I should say.

4             THE COURT:  Mr. Tranese did you read over your

5  presentence report?

6             MR. TRANESE:  Yes.

7             THE COURT:  Did you have an opportunity to discuss

8  the contents of that report with your counsel.

9             MR. TRANESE:  Yes.

10            THE COURT:  Are you satisfied in how he represented

11 you?

12            MR. TRANESE:  Yes.

13            THE COURT:  The guidelines, the Probation Department

14 has it as total offense level 32, criminal history category

15 one, 121 to 151 months.  The Government agrees with the

16 defendant's position at paragraph 33, that plus three should

17 be removed, correct?

18            MR. MILLER:  Yes, your Honor.

19            THE COURT:  Because he was not a manager or

20 supervisor.  From my review of the facts that seems to be

21 accurate.

22            So the Government believes that the guideline range

23 is 28, criminal history category one, that's arrived at by

24 both eliminating the three points for manager or supervisor

25 and for providing an additional point for global plea.

SENTENCING

1        MR. MILLER:  Yes, your Honor.

2        THE COURT:  So 28, which is 78 to 97.

3        MR. MILLER:  That's correct, your Honor.

4        THE COURT:  Do you agree with that, Counsel?

5        MR. AIDALA:  Yes, your Honor.

6        THE COURT:  We have an agreement.  I think both

7   parties agree what the guideline range should be.

8        And the Government's position is with Mr. Tranese

9   there should be a guideline sentence within that --

10        MR. MILLER:  That's correct.

11        THE COURT:  -- range.  Whereas, with respect to

12   Mr. Grado you take the position that it should be 180 months.

13        MR. MILLER:  In excess of 180 months.

14        THE COURT:  In excess.

15        MR. MILLER:  I believe that's what we said.

16        THE COURT:  That's 15 years, correct?

17        MR. MILLER:  Yes, your Honor.

18        THE COURT:  Could the Government talk -- let me

19   proceed now with Mr. Grado.  Is there any reason, Counsel,

20   with respect to Mr. Grado why we should not proceed with

21   sentencing?

22        MR. IANDOLO:  No, your Honor.  He's aware of

23   everything that is going on.

24        THE COURT:  In the presentence report there is an

25   allegation that in addition to Mr. Grado brandishing a gun,

SENTENCING

1    that one of his relatives stabbed the Doctor.  Do you want to

2    tell me more about that?

3            MR. MILLER:  Yes, your Honor.  What I can tell you

4    about that is a witness would testify that he had gotten -- a

5    witness would testify that the Doctor had received a new

6    shipment of prescription pads.  And that there was an attempt

7    to hide them from Mr. Grado.  That after Mr. Grado learned

8    about them being hidden from him, the prescription pads being

9    hidden from him, the relative stabbed the Doctor in the rear.

10           THE COURT:  I take it these were not life

11   threatening injuries.

12           MR. MILLER:  That's right, your Honor.

13           MR. IANDOLO:  If I may rebut that?

14           MR. MILLER:  And Mr. Grado was present when that

15   occurred.

16           THE COURT:  Okay.  This is why I asked earlier,

17   Counsel, whether there were challenges, factual challenges, to

18   the report, and you said there weren't.

19           MR. IANDOLO:  I want to rebut that with two things.

20           First being stated that at all relevant times I

21   think the Government will agree, that at the inception of

22   their relationship, Mr. Grado was trying to help the Doctor,

23   because the Doctor had his own drug problems and my client was

24   trying to get him off of --

25           THE COURT:  By stabbing him in the rear?

SENTENCING

1          MR. IANDOLO:  He wasn't at that meeting or that

2     incident.

3          As far as it happening is one thing, and him being

4     there is a second thing.  And whether it was at our direction.

5          THE COURT:  Aren't these things we bring out before

6     we come out here?

7          MR. IANDOLO:  The fact that it happened is not

8     disputed.  The fact that we were there and at our direction --

9          THE COURT:  Isn't that what the report says?  It

10    says, on another occasion when Grado and the Doctor and others

11    were present together inside the office, that one of Grado's

12    relatives stabbed the Doctor when Grado learned that Doctor

13    had hidden the prescription pad.

14         That's right there.

15         MR. IANDOLO:  It doesn't say he was there, maybe at

16    the facility, it does not say he was there.

17         THE COURT:  It says, while Grado, the Doctor and

18    others were present together inside the office, that Grado had

19    established with the Doctor one of Grado's relatives stabbed

20    the Doctor after Grado learned the doctor had hidden the

21    prescription pads from Grado.

22         Am I reading that incorrectly?

23         MR. IANDOLO:  Your Honor, we're going to contest the

24    fact that we were not there at that time.

25         THE COURT:  Why didn't you do that before?

SENTENCING

1          MR. IANDOLO:  Sorry, your Honor.

2          THE COURT:  What is the Government's position on

3    this, now that you know it's contested?

4          MR. MILLER:  Your Honor, I think what he's

5    contesting is a very narrow slice of that, which is that he

6    was present.  I think the circumstantial evidence is pretty is

7    overwhelming of why the stabbing would have occurred.  It's a

8    relative in the office of Grado.  I don't know that it

9    matters, certainly doesn't matter for the guidelines

10   calculation as we've talked about already.

11         THE COURT:  But the rest of that paragraph is not

12   contested?  The fact that he was stabbed, I believe that's

13   contested.  It says in eight, same conversation, Grado told

14   the Doctor if the doctor's newly ordered prescription pads go

15   into anybody's hand other than Grado, I'll put a bullet right

16   into your head.

17         He also it says, additionally during the course of

18   the conspiracy on at least one occasion Grado brandished a gun

19   at the Doctor in a threatening manner to reiterate to the

20   Doctor that his prescription pads were under Grado's control.

21         MR. IANDOLO:  That is on taped conversation, so we

22   don't contest that part.

23         THE COURT:  Okay.  Do you want to be heard?

24         MR. IANDOLO:  Yes, your Honor.

25         Your Honor, if we may, at the direction of my client

SENTENCING

1    we're going to be short and to the point.  Before this Court

2    sentences Mr. Grado we ask that you take into account all the

3    standards of the 3553 which are laid out in our papers.

4           Throughout the time Mr. Grado, and it's laid out,

5    that Mr. Grado has substantial health problems, cellulitis and

6    his diabetes which are could be life threatening, his legs are

7    in very poor shape, discolored, and he needs severe medical

8    attention.

9           In the courtroom is his whole family besides his

10   mother.  His mom has a fear of traveling, it's a serious

11   phobia she's being treated for.  His father stands in this

12   court, with Mr. Grado's daughter, Mr. Grado's ex-wife, and a

13   few of his other friends and colleagues.

14          Mr. Grado wants the Court to know that when you

15   sentence him that you have leniency on them, and not him.  He

16   stands before the Court understanding what he has done and

17   what he has done is wrong.  He has while he was in holding he

18   went to, he completed, a program, the Focus Forward program.

19   Mr. Joe Putnam is sitting here in support of Mr. Grado's

20   completion of that program.  The program had drafted a letter,

21   which was attached to my supplemental of November 20, it's

22   actually touching how it was written.  Mr. Grado often lends a

23   hand where he is, the same way he tries to lend a hand in this

24   case.

25          Taking all of those small instances into account,

SENTENCING

1  Mr. Grado truly only asks that this Court sees that his family

2  is going to be void of a lot of joyous occasions and he's

3  asking that you take leniency on them.  We ask that you depart

4  even further from the Government's seeking 180 months, which

5  is 15 years; closer to 98-month mark, only for the mere fact,

6  once again, Mr. Grado's health is not good shape.  Anything

7  longer than that could be a death sentence to Mr. Grado.

8  Thank you.

9              THE COURT:  Before I hear from Mr. Grado does the

10  Government want to add anything to their letter?

11             MR. MILLER:  Yes, your Honor briefly.  I think what

12  you have here is a dangerous mixture of extremely dangerous

13  drugs, a large number of extremely dangerous drugs, credible

14  threats of violence, and a scheme that is backed up by the

15  defendant's membership in the Lucchese crime family.  It is

16  the end, or the latest instances I should say, in a history of

17  criminal activity involving the defendant including very

18  serious charges in this Court in the past.

19             THE COURT:  Let me ask you about his criminal

20  history.  There were very serious charges in 1994, but a lot

21  of the more recent criminal history category for which he got

22  a significant number of points were shoplifting, larceny, they

23  weren't crimes similar to the one that was very serious, I

24  grant you, back in '94.

25             MR. MILLER:  That's very true, your Honor.  There

SENTENCING

1    are a number of convictions for low-level, relatively

2    low-level crimes misdemeanors.  But, one, there is a

3    significant number of them.  And two, for a very long time he

4    was running a sophisticated oxycodone distribution

5    organization.  As you can see from our letter, there are some

6    incredibly chilling threats of violence where the defendant

7    threatened to put a bullet in people's heads, threaten to put

8    a bullet in the Doctor's head, threaten to put a bullet in

9    Larry's head, I submit to you that is Larry Tranese.

10        I don't think that you should infer from the fact

11   that he only has a number of misdemeanor convictions that he

12   has changed his stripes.  Certainly during the time period of

13   the offenses that are happening here, he was both selling

14   large amounts of dangerous dugs, utilizing the resources of

15   organized crime, and engaging in, if not actual violence,

16   extremely credible threats of violence.  I know, your Honor,

17   had the opportunity to hear the recordings that were submitted

18   with our letter.

19        With respect to the defendant's family, any sentence

20   has an effect on a defendant's family.

21        As we note in our letter, the defendant involved

22   members of his family in his oxycodone distribution scheme,

23   both the defendant's father and the defendant's ex-wife.  And

24   so it, of course, will have an impact on them going forward.

25   I don't think that that is something that could have been

SENTENCING

1   thought of ahead of time.

2          For those reasons, we think that a significant

3   sentence is appropriate.  The sentence we are asking for is a

4   term of imprisonment in excess of 180 months; that is

5   50 percent discount from the low end of the guideline range.

6   And we think that is sufficient but not greater than necessary

7   in this case.

8          MR. IANDOLO:  May I?

9          THE COURT:  Yes.

10         MR. IANDOLO:  Two things.  First, I want to point

11  out Mr. Grado's age.  Obviously he's an elderly man, he's not

12  a young guy.

13         THE COURT:  He's elderly?

14         MR. IANDOLO:  He's 55 years old.

15         THE COURT:  Don't make me feel bad.

16         MR. IANDOLO:  I don't mean that by any means.

17         Anything more than 98 months he's going to come out

18  even more older than he already is.  His father, that counsel

19  speaks of, is in his later years as well.  Mr. Grado only has

20  one wish, that he actually come out and see his father when he

21  comes out.  He's not looking to go back into the life of crime

22  when he comes out.

23         Secondly is the fact that his -- as far as to his

24  ex-wife, he wants to clarify, at no time was she involved in

25  anything of that sort.  He only states he was trying to get

1    her a legitimate job -- to get the doctor to work with him.

2                THE COURT:  Mr. Grado, did you want to the say

3    anything before the Court sentences you?

4                MR. GRADO:  No, your Honor.

5                THE COURT:  You could speak if you would like to.

6                MR. GRADO:  I'm good.  Thank you.

7                THE COURT:  All right.  I have read over the

8    presentence report, considered the sentencing submission by

9    both the Government and defense counsel, and considered the

10   3553 factors.  The guideline range here, which is 360 to life,

11   I think is excessive and the Government has recognized that as

12   well.  Even though this is an extraordinarily serious matter,

13   still those type of guidelines don't seem appropriate and are

14   not consistent with the dictates of 3553.

15               Let me just review some of the factors in the

16   guidelines.  One is the seriousness of the offense and the

17   need to promote respect for the law.  As we read in the papers

18   every day, the drug that was involved here is an

19   extraordinarily dangerous drug.  And has resulted in

20   wide-spread addiction and death; I'm not saying death are

21   linked to the drugs the defendant sold.  But it's a very, very

22   serious offense.  There were I think over, if I'm correct,

23   over 4,000 grams of oxycodone involved in this case.  So it's

24   a very serious offense.

25               It was accompanied by violence, that hasn't been

SENTENCING

1   disputed, that the defendant himself brandished a gun,

2   relatives of his even, if Mr. Grado weren't present, assaulted

3   the doctor.  That's another very negative factor.

4          The sentence has to promote respect for the law,

5   provide just punishment, serve as a deterrent.  I think there

6   is a necessity for a deterrent feature here.  Mr. Grado does

7   have a long history of criminal activity.  Although I have to

8   say that I do believe that a criminal history category six,

9   which is accurate, really does overstate his particular

10  criminal history category, but nonetheless he has consistently

11  engaged in criminal conduct.  So there is a deterrent feature

12  here to be served.

13         As always, the concept of general deterrence.

14         I've considered the history and characters of the

15  defendant.  As the Government points out, it's not disputed

16  here, that he's a member of organized crime.  I recognize when

17  considering the history and characteristics of the defendant

18  that there are health issues here that should be considered by

19  the Court.

20         Having considered all of the factors I think that

21  the sentence that the Court is intends to impose is one that

22  is substantial, not as substantial as that sought by the

23  Government, but we have a defendant here although he engaged

24  in serious criminal conduct, has admitted to the conduct.

25         I'm going to sentence the defendant to the custody

SENTENCING

1    of the Bureau of Prisons for 144 months to be followed by a

2    three-year term of supervised release.  I will impose a

3    special assessment of $100.  I won't further impose a fine.

4    It's not clear on anything that's been presented that he can

5    pay a fine.

6           I'll make it a condition of his supervised release

7    that he abstain from using drugs and that he not have contact

8    with victim here, I'm referring to the victim as the doctor.

9    I don't know that he's a victim in the sense of the fact that

10   he was not involved, if anything he was a co-conspirator, but

11   there were threats made to him and to the extent that he's a

12   victim in that sense I'll prohibit any contact with him.

13          Mr. Grado, I think the sentence the Court imposed,

14   you've given up your right to appeal, your right to appeal

15   sentence, any notice of appeal has to be filed within 14 days.

16   Do you understand that?

17          MR. GRADO:  Yes.

18          THE COURT:  Is there anything I overlooked from the

19   Government's perspective?

20          MR. MILLER:  I handed up the forfeiture order.

21          THE COURT:  Is there any reason not to sign the

22   forfeiture order?

23          MR. IANDOLO:  No.

24          THE COURT:  Is there anything that I've overlooked

25   from --

SENTENCING

1              MR. IANDOLO:  No, your Honor.

2              THE COURT:  I don't know if it's helpful for the

3    Marshals for Mr. Grado to leave.

4              THE MARSHAL:  Yes, we'll leave.

5              (Colloquy continues regarding Mr. Tranese.)

6              (Whereupon, the matter was concluded.)

7                    *    *    *    *    *    *

8    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

9

10   Rivka Teich, CSR RPR RMR FCRR
     Official Court Reporter
11   Eastern District of New York

12

13

14

15

16

17

18

19

20

21

22

23

24

25