```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                            17-CR-559(CBA)
 3   UNITED STATES OF AMERICA,
                                            United States Courthouse
 4                                          Brooklyn, New York

 5          -against-                       December 06, 2018
                                            12:30 p.m.
 6   ANTHONY GRADO AND LAWRENCE
     TRANESE,
 7
            Defendants.
 8
     ------------------------------x
 9
            TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
10             BEFORE THE HONORABLE CAROL B. AMON
                 UNITED STATES DISTRICT JUDGE
11
     APPEARANCES
12   For the Government:       UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  MATT JACOBS, ESQ.
                                    MATTHEW MILLER, ESQ.
15                             Assistant United States Attorneys

16   For Grado Defendant:     J. IANDOLO LAW P.C.
                               7621 13the Avenue
17                             Brooklyn, New York 11228
                               BY:  JEREMY M. IANDOLO,ESQ.
18
     For Tranese Defendant:    LAW OFFICES OF AIDALA &
19                             BERTUNA PC
                               8118 13th Avenue
20                             Brooklyn, New York 11228
                               BY:  ARTHUR AIDALA, ESQ.
21
     Also Present:             JEREMY NEISS, Probation
22
     Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
23                             Phone:  718-613-2268
                               Email:  RivkaTeich@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

SENTENCING - GRADO

1          (In open court.)

2          THE COURTROOM DEPUTY:  All Rise.  Criminal cause for

3    sentencing, 17-CR-559, U.S. versus Anthony Grado, and U.S.

4    versus Lawrence Tranese.

5          Counsel, state your appearances for the record.

6          MR. MILLER:  Good afternoon, your Honor, Mathew

7    Miller and Matthew Jacobs for the United States.  We're joined

8    by Probation Officer Jeremy Neiss.

9          MR. NEISS:  Good afternoon, your Honor.

10         MR. AIDALA:  Good afternoon, your Honor.  On behalf

11   of Mr. Tranese, Arthur Aidala.  And accompanying me from my

12   law firm is my partner Michael Jaccarino.

13         MR. IANDOLO:  Jeremy Iandolo on behalf of the

14   defendant, Anthony Grado.

15         THE COURT:  Good morning.  Everyone can be seated.

16         Before we begin, I have one question with respect to

17   Mr. Tranese.  There is an enhancement to his guideline range,

18   two points for use of violence.  It appears to me that that is

19   disputed.  Do we need a Fatico hearing on that?

20         MR. MILLER:  Your Honor, I can speak to that.

21   Before I do I'll note that we're joined by Special Agent

22   Chance Adam at counsel table from the FBI.

23         The enhancement is for either the use or the threat

24   of force.  The threat of force was stipulated to; the use was

25   contested.  The facts of use were contested.  We're not

3

SENTENCING - GRADO

1  intending to proceed today on the actual use of force but are

2  relying on the stipulated implied threat, the threat of force.

3  So the guidelines range is unchanged.

4          THE COURT:  Where was that stipulated?

5          MR. MILLER:  In the plea agreement, your Honor,

6  paragraph two it sets forth the base offense level, plus the

7  use or threat of violence under 2D1.1(b)(2).  And then further

8  down in the paragraph, the defendant stipulates to the above

9  guideline change, except reserves his right to dispute the

10 relevant conduct portion of it.

11         THE COURT:  Mr. Aidala, what I'm not sure what

12 you're disputing then.  I understood you to be disputing that

13 anyone was physically assaulted.

14         MR. AIDALA:  That's correct.

15         THE COURT:  I understood it to go past that.  It

16 says at page six, Larry vehemently denies threatening get that

17 especially with violence.  That seems to be to still be

18 disputed.  Do you have at plea agreement there I don't have a

19 copy?

20         MR. MILLER:  Yes, your Honor.

21         THE COURT:  So I don't know how to square those two

22 things.

23         MR. AIDALA:  Your Honor, I believe in terms of

24 background there were extensive conversations with the

25 Government about this particular area of the plea agreement.

SENTENCING - GRADO

1    We do feel very strongly, and we made that clear, there was no

2    physical violence.  I believe what we agreed on was that the

3    Doctor may have perceived, due to circumstances, that there

4    was a threat.  But in terms of what the Court has experienced

5    in the Court's long, distinguished career, the threat of "I'm

6    going to put a bullet in your knee unless you do this," or,

7    "I'm going to hit with you a bat unless you do that," those

8    are not the type of threats we're referring to, eventually

9    when I'm allowed to address the Court.

10         There was an issue of the Doctor here not paying

11    rent, legitimate rent, to Mr. Tranese.  And so there may have

12    been some threats, if you don't pay the rent you're going to

13    have a problem.

14         I don't want the Court to believe it's the same

15    thing as dealing with, if you don't give me my money I'm going

16    to kill you or break your legs.  So it's a fine line, your

17    Honor, regarding the facts here.

18         I think what we were arguing, we didn't want to give

19    the Court the misrepresentation that they were the type of

20    threats that the Court normally hears about and deals with.

21         THE COURT:  The guideline says and this is -- so the

22    guideline says that you increase by two levels if the

23    defendant used violence or made a credible threat to use

24    violence.  So the Government is relying on the fact that he

25    made a credible threat to use violence.  You're not proceeding

SENTENCING – GRADO

1    to prove that he slapped him, which is something that is said.

2              MR. MILLER:  That's right, your Honor.

3              THE COURT:  Your credible use of violence is based

4    on the quote of page three of your letter.

5              MR. MILLER:  That's right, your Honor.

6              THE COURT:  I'm still not sure, Mr. Aidala, where we

7    are, where we come out on this.  It seems to me that you're

8    challenging it.  Because the violence has to be in connection

9    with the crime, not in connection with paying rent.  And it

10   still seems to be challenged.

11             MR. MILLER:  Yes.

12             MR. AIDALA:  Yes, your Honor, the Court is correct.

13             Even on page three where there is that text message

14   the Government highlights that my client, two hours later

15   replies, I'm here why don't you come out so we can have a chat

16   and we'll both be on camera.  Meaning, if I was going to do

17   something to you there is cameras out here and we'll both be

18   on the camera together, so obviously I don't have a real

19   intention of doing something to you in a way that is going to

20   be so public.

21             THE COURT:  I think we have a dispute here.  I think

22   if you're saying there is a stipulation to it in the plea

23   agreement, and that's the basis of it then what is the

24   Government's position here?

25             MR. MILLER:  May I have a moment, your Honor?

SENTENCING – GRADO

1          THE COURT:  Yes.

2          MR. MILLER:  So, your Honor, I think that the

3   language in the text message on the bottom of page three, it's

4   evidence of not just the threat that comes after that but that

5   something had preceded that text message, that in the view of

6   the victim, was sufficiently threatening to force him to write

7   the things that he wrote.  So our position is that this text

8   message makes out and supports both the stipulation and the

9   enhancement under that provision of the guidelines.

10          THE COURT:  It's not clear to me that you

11   actually -- yes, I guess you -- I'm not sure you actually

12   challenged the guideline calculation that relied on this, did

13   you?  You challenged the fact that --

14          MR. AIDALA:  Your Honor --

15          THE COURT:  -- that he slapped him, but did you

16   challenge the guidelines?

17          MR. AIDALA:  I believe we have the ability to argue.

18   I guess the word that I would highlight for the Court would be

19   the word implied, it could be an implied threat as opposed to

20   an express threat.  In our conversations with the Government,

21   it was more focused on how the receiver of the information was

22   observing it and translating it as opposed to the intention of

23   Mr. Tranese.  What is most important to Mr. Tranese is that

24   the Court not have the wrong impression that there was any

25   physical contact, number one.  And the paragraph that the

SENTENCING - GRADO

1   Government submits is a good example of kind of where the

2   defendant -- where the Doctor thought Mr. Tranese was coming

3   from.  In there he says, you want to threaten me, the threats

4   are going to end, et cetera, et cetera.  Obviously he's under

5   the impression that Mr. Tranese was threatening him, whether

6   or not Mr. Tranese was or was not threatening him, it's what

7   his own intentions were.

8           So I think the dead end that we reached with the

9   Government in trying to reach this agreement was that although

10  Mr. Tranese's intent may not have been to explicitly threaten

11  him, there must have been an implied threat because the Doctor

12  would not have made those statements had there not been some

13  sort of implied threat that another human being listening to

14  information would --

15          THE COURT:  The question is, was it your, was it the

16  defendant's intention either to imply a threat or make a

17  threat.  Because I don't know how that guideline application,

18  the plus two, is added if there is a denial that there was any

19  implied threat, how it's added as the result of an admission.

20  It may be that the Government can prove it, but I thought

21  according to the agreement it was stipulated to.

22          MR. MILLER:  I think that's right, your Honor.  I

23  don't think there is a dispute about the two points applying.

24          THE COURT:  There may not be -- when the witness is

25  dancing around.  You reached an agreement you're putting it in

SENTENCING - GRADO

1    the Court's lap.  You're dancing around this.  If these two

2    points apply, if it was a part of the plea agreement, then the

3    defendant could do a couple of things, I suppose, which is not

4    challenge that the Government can prove it.  But I don't think

5    you can deny it and then say but it's okay to add the two

6    points.  I just have a little problem with how this is going

7    here.

8           MR. AIDALA:  Okay, your Honor, if I may.

9    Mr. Tranese never made an explicit threat.  Mr. Tranese would

10   accept responsibility for putting together a set of facts and

11   a set of words that came out of his mouth that a reasonable

12   person would imply as a threat.

13          THE COURT:  So would it be correct to say that

14   you're not challenging the fact that the Government can prove

15   that he made a threat here.

16          MR. AIDALA:  That would be correct.

17          THE COURT:  Which would add the two points, is that

18   perhaps the best way to analyze this, that you're not

19   challenging that the Government can make that out.

20          MR. AIDALA:  That's correct, your Honor.

21          THE COURT:  Okay.

22          MR. MILLER:  Thank you, your Honor.

23          THE COURT:  What I think is probably the most

24   expeditious way to proceed, is to assure that with respect to

25   both defendants we iron out the issue of what the guidelines

SENTENCING – GRADO

1    are with respect to each defendant.  Then I'll proceed first

2    in terms of the actual sentencing with Mr. Grado and then with

3    Mr. Tranese.  To the extent that there is any issue about

4    guidelines that may potentially effect both, I want to make

5    that determination first.

6              Let me turn first to Mr. Grado.  Let me make a

7    couple of preliminary inquiries.  I want to be assured that I

8    have all the papers here.

9              I have a presentence report for Mr. Grado, an

10   addendum to the presentence report.  A letter dated August 6

11   from the Government.  A sentencing submission, a lengthy

12   sentencing memorandum, on Mr. Grado's behalf.  And then I have

13   what I guess is an addendum to that on November 20.

14             Counsel, are there any other documents that you

15   believe the Court should have in this record?

16             MR. IANDOLO:  No, your Honor.

17             THE COURT:  Does the Government believe there is

18   anything else --

19             MR. MILLER:  No, your Honor.

20             THE COURT:  -- should be in the record?

21             Let me ask Mr. Iandolo, have you reviewed the

22   presentence report and the addendum to the report with your

23   client?

24             MR. IANDOLO:  Yes, everything has been reviewed with

25   my client.

SENTENCING – GRADO

1          THE COURT:  It's better if you stay seated, for the

2    microphones, it probably works better if you stay seated.

3          Mr. Grado, did you read your presentence report?

4          MR. GRADO:  Yes.

5          THE COURT:  Did you read the addendum to the report?

6          MR. GRADO:  Yes.

7          THE COURT:  Did you have an adequate opportunity to

8    discuss the contents of that report with your counsel?

9          MR. GRADO:  Yes.

10          THE COURT:  Are you satisfied to have him represent

11    you?

12          MR. GRADO:  Yes.

13          THE COURT:  Mr. Iandolo, are there any challenges to

14    the information contained in the report?

15          MR. IANDOLO:  No, your Honor.

16          THE COURT:  Do you agree with the guideline

17    calculation that's set forth in the report.

18          MR. IANDOLO:  They were stipulated to by the

19    Government and myself.

20          THE COURT:  I think there is a difference between

21    the report and -- unless it was corrected in an addendum.

22          MR. MILLER:  I think there is a difference between

23    the guideline calculation in the report and in the plea

24    agreement.  As we noted in our sentencing submission, we are

25    agreeing to proceed.  We believe that the Probation

SENTENCING – GRADO

1    Department's calculations are correct, but agreeing to proceed

2    under the more favorable calculations in the plea agreement.

3              THE COURT:  In your plea agreement letter you found

4    that the adjusted offense level was 43, but a criminal history

5    category of four, right, that's what the plea agreement was?

6              MR. MILLER:  That's right, your Honor.

7              THE COURT:  I wasn't clear on how many levels did

8    you give off for acceptance for responsibility, was it three

9    or?

10             MR. MILLER:  Normal, three, your Honor.

11             THE COURT:  The regular three.

12             MR. MILLER:  Yes.

13             THE COURT:  So then your guideline range that you

14   agreed to was 40 with a criminal history category of four,

15   which was 360 to life.

16             MR. MILLER:  Plus an additional point off for global

17   disposition, so 39 and four, which was also 360 to life.

18             THE COURT:  Was the extra point off also applicable

19   to Mr. Tranese's case?

20             MR. MILLER:  Yes.

21             THE COURT:  So a global disposition with two

22   defendants.

23             MR. MILLER:  Yes, your Honor.

24             THE COURT:  Okay.  So then you believe that the

25   guideline range should be 39, criminal history category four,

SENTENCING - GRADO

1   which was 360 to life.

2           MR. MILLER:  Yes, your Honor.

3           THE COURT:  The probation report has criminal

4   history category -- just to go through it -- it's base offense

5   level 36, that's agreed to, correct, that's not something that

6   you challenged.

7           MR. MILLER:  Correct, your Honor.

8           THE COURT:  Then plus two for possessing the

9   firearm, that's not challenged, correct, counsel?

10          MR. IANDOLO:  Correct.

11          MR. MILLER:  Possessing the firearm is in dispute.

12          THE COURT:  I'm sorry?  Did the Government have that

13  in their --

14          MR. MILLER:  We did not have it in the plea

15  agreement; it was in the PSR.

16          THE COURT:  So you do dispute that?

17          MR. MILLER:  We are not seeking to have the firearm

18  enhancement included.  We think it is correct, but it was not

19  in the plea agreement so we're not seeking to proceed with

20  that.

21          THE COURT:  This is based on the allegation that he

22  pulled a firearm on the --

23          MR. MILLER:  Yes, your Honor.

24          THE COURT:  -- the doctor.

25          MR. MILLER:  Yes.

1        THE COURT:  I know it's not in the plea agreement,

2    but are you disputing that fact?

3        MR. IANDOLO:  Your Honor, it wasn't on our original

4    agreement so we are disputing it.  But we're under the same

5    impression that it should not be -- it's not relevant.  It

6    should not be deemed relevant conduct here.

7        THE COURT:  The Government didn't put it in there,

8    why?  Because you didn't notice it?

9        MR. MILLER:  A mistake, your Honor.

10       THE COURT:  But you told me earlier you weren't

11   challenging any of the facts in the report, right?

12       MR. IANDOLO:  Your Honor, we went through and if we

13   over-looked it, we went through it on multiple occasions.

14       THE COURT:  I'm sorry, what?

15       MR. IANDOLO:  My client and myself went over this on

16   multiple occasions.  We looked at bottom number.  The bottom

17   number, it was never -- I was having the sentencing submission

18   that I gave you as an exhibit, but it wasn't part of our

19   original agreement.

20       THE COURT:  But you're not disputing the facts in

21   the report.

22       MR. IANDOLO:  The facts are the facts.  And the

23   facts do layout so, yes, there is no disputing.

24       THE COURT:  With the extra point off it would be,

25   according to probation's calculations, if they gave that extra

SENTENCING - GRADO

1  point off for the global plea, it would be 42, criminal

2  history category six, correct?

3              MR. MILLER:  Yes, your Honor.

4              THE COURT:  Which also is 360 to life, right?

5              MR. MILLER:  Yes, your Honor.

6              THE COURT:  So it's the same.

7              MR. MILLER:  It's the same.

8              THE COURT:  So you believe that I should find that

9  the guideline range here, whether I invoke criminal history

10  category four or six, or whether it's 40 or 42, it results in

11  the same guideline range, 360 to life, correct?

12             MR. MILLER:  Yes.  And I think I just need to

13  confirm it, even if it's 39, which would be the 40 minus the

14  global point, 39 and four, which is most favorable to the

15  defendant, I believe is also 360.

16             THE COURT:  The only thing, though -- let me do the

17  math.

18             What I understand the defendant to be disputing in

19  the Probation Department's calculation is the two points and

20  the criminal history category, correct?  That would be

21  according to your agreement?

22             MR. MILLER:  That's right.

23             THE COURT:  So according to the agreement that you

24  reached with the defendant, your agreement would have been 39

25  and four; is that right?

SENTENCING - GRADO

1        MR. MILLER:  That's correct, your Honor.

2        THE COURT:  And 39 and four is 360 to life.  And if

3   the probation, assuming their calculations are correct, and

4   they also give the extra point that you agreed to, that would

5   be 42 and six.

6        MR. MILLER:  Yes, your Honor.

7        THE COURT:  Which is also 360 to life, correct?

8        MR. MILLER:  Correct.

9        THE COURT:  Other than the fact that the Government

10  agreed to a criminal history category four or mentioned that

11  in the plea agreement, is there any other basis that you're

12  disputing the criminal history category six?

13       MR. IANDOLO:  Your Honor, there was some things that

14  I believe I went through with Mr. Jacobs on a few occasions

15  that were outside the ten or 15-year scope, depending on the

16  calculations.  I don't have those numbers in front of me at

17  this time what is outside the scope or not to put them in

18  category four and not a six.  Obviously, the time frame on

19  either of the two are the same, 360 to life, but obviously we

20  want what was agreed to as the criminal history category, so

21  your Honor would be able to see that Mr. Grado is not as bad

22  as his criminal history category makes him.

23       THE COURT:  What is wrong about what the probation

24  office did with regard to the criminal history category?

25       MR. IANDOLO:  Two of the felonies are over 20 years

SENTENCING – GRADO

1    old.  I think that's where the number came from .

2              THE COURT:  Over how long?

3              MR. IANDOLO:  Over 20 years old.

4              THE COURT:  Why isn't paragraph 44 too old?  Is it

5    because of the violations?

6              MR. IANDOLO:  He was released 17 years ago on it.

7              MR. MILLER:  It's from the time of the crime, your

8    Honor, so the offenses were back in 2012.

9              THE COURT:  From the time of what?

10             MR. MILLER:  From the time, not the time of

11   sentencing but time of the offense.  He's in custody.

12             THE COURT:  Time of the offense would have been an

13   earlier date.  What do you mean?

14             MR. MILLER:  It is properly included.

15             THE COURT:  I'm not following you.

16             MR. MILLER:  It was in 1999, 15 years after 1999

17   when he was released from custody.

18             THE COURT:  So you're counting it from the date he

19   was released from custody.

20             MR. MILLER:  Which is what is appropriate under the

21   guidelines.

22             THE COURT:  Not the date he committed the crime.

23             MR. MILLER:  The instant offense was 2012, 15 years

24   before that.

25             THE COURT:  I thought you were talking about the

SENTENCING - GRADO

1   date he committed the crime.

2           MR. MILLER:  I'm sorry.

3           THE COURT:  I don't see there is any -- I have to

4   find a guideline range here.  I think it's accurately

5   calculated in the presentence report at a 42, criminal history

6   category six, which is 360 to life.  I note that it doesn't

7   really make a difference under the calculations because even

8   39 and four, which is the most favorable to the defendant,

9   produces the same guideline range.  The Government takes the

10  position here -- you're not taking the position that a 30-year

11  sentence, or rather I should say the guideline sentence, is

12  appropriate here, correct?

13          MR. MILLER:  No.  We're arguing for a sentence below

14  the guidelines.

15          THE COURT:  Okay.  Let me turn to Mr. Tranese's

16  guideline range.  First.

17          Of all, let me assure Mr. Aidala, that I have all

18  the papers that I should have for Mr. Tranese.  I have a

19  presentence report, I believe there is an addendum to that

20  report as well.  I have a sentencing submission dated July 12

21  and a letter from the Government dated August 6.

22          Are there any documents that I should have?

23          MR. AIDALA:  Your Honor, we submitted a letter on

24  July 12 to probation regarding our objections to the

25  presentence report.

SENTENCING - GRADO

1          THE COURT:  Okay.

2          MR. AIDALA:  I don't know if it's extremely relevant

3   for today, but it does --

4          THE COURT:  July 10?

5          MR. AIDALA:  Yes, your Honor.

6          THE COURT:  Now with respect to -- but, those are

7   the all the documents?

8          MR. AIDALA:  Yes.

9          THE COURT:  Does the Government agree to that?

10          MR. MILLER:  We submitted a response on July 13 to

11   their objections.

12          THE COURT:  I don't know that I have that, I don't

13   think that's necessarily --

14          MR. MILLER:  I'm happy to hand it up if your Honor

15   wants.

16          THE COURT:  Okay.  In this you say you're prepared

17   to prove that the defendant slapped the Doctor, but you're not

18   prepared to prove that now.

19          MR. MILLER:  Correct, your Honor.

20          THE COURT:  You agree that he should not have

21   obtained a managerial role.

22          MR. MILLER:  That's correct.

23          THE COURT:  Let me ask Mr. Aidala, have you read the

24   presentence report, the addendum report, and discussed them

25   with Mr. Tranese?

SENTENCING – GRADO

1          MR. AIDALA:  Yes, your Honor.

2          THE COURT:  Are there any factual challenges to

3    materials in the presentence report that we haven't discussed?

4    I know you challenged the assault statement, but anything

5    other than that?

6          MR. AIDALA:  We challenged the assault statement

7    which is in paragraph 20.  Paragraph 23 addresses the

8    guidelines, the enhancement for his role.  And, your Honor,

9    paragraph 18 alludes to Mr. Tranese's organized crime ties.

10   We're objecting to that as well.

11         THE COURT:  Have you challenged that in the past?

12         MR. AIDALA:  I do not believe that that was in our

13   written submission.

14         It's on a letter to the Court, your Honor, I

15   apologize.  It's strongly worded in our letter to the Court.

16   It's not in our objection letter.

17         THE COURT:  Tell me where in your letter to the

18   Court; I want to make sure I've seen this.

19         MR. AIDALA:  Sure.

20         THE COURT:  You say that he -- you basically say he

21   wasn't an organized crime associate, that he was just friends

22   with this fellow Manny Lavuzo (ph).

23         MR. AIDALA:  Life-long, childhood friends, since

24   they were like nine years old.

25         THE COURT:  Are you objecting to the fact that Grado

SENTENCING – GRADO

1  and Tranese arranged a sit down?

2          MR. AIDALA:  We're objecting to the fact that the

3  sit down was arranged by Mr. Tranese, yes.  We're not --

4          THE COURT:  It says both of them.  It says Grado and

5  Tranese arranged a sit down, a meeting between a member of the

6  Colombia organized crime family, that I guess is this guy

7  Manny.

8          MR. AIDALA:  Yes, your Honor.  We don't have any

9  knowledge whether that meeting did take place or did not take

10  place.  It very well may have taken place, but it was not done

11  so at the behest of Mr. Tranese.  No one is alleging that

12  Mr. Tranese was at that meeting.

13          THE COURT:  You're not challenging that there could

14  have been a meeting which was to resolve the dispute over --

15          MR. AIDALA:  We have no knowledge.

16          THE COURT:  -- the pads?

17          MR. AIDALA:  We have no knowledge of that one way or

18  the other.

19          THE COURT:  What is the Government's position on

20  this?

21          MR. MILLER:  Our position is the meeting occurred.

22  It was to resolve the dispute about this.

23          THE COURT:  Were the defendants there?

24          MR. MILLER:  I don't know if Mr. Tranese was there.

25  But it was on his behalf with Manny Lavuzo.

SENTENCING – GRADO

1            THE COURT:  Acting on his behalf.

2            MR. MILLER:  Yes.

3            MR. AIDALA:  If I may, someone can do something on

4    someone's behalf but not because they asked them to do it, but

5    just because they stepped in and took matters into their own

6    hands.

7            THE COURT:  You mean like a really good friend.

8            MR. AIDALA:  They've know each other since they are

9    nine years old.

10            MR. MILLER:  Your Honor, as we pointed out in our

11    sentencing letter, beginning on page seven, there is ample

12    evidence of the association between this member of the

13    Colombia family and Mr. Tranese in multiple different

14    instances.  And so to the extent there is a dispute about

15    whether he is an associate of the family or not, I think the

16    facts laid out in the letter certainly are enough to prove

17    that by a preponderance of the evidence.

18            MR. AIDALA:  They definitely know each other for a

19    very long time, close friends, definitely family friends since

20    childhood.  I'll address that at the appropriate time.

21            THE COURT:  What is your proof that he asked Lavuzo

22    to intervene in the dispute between him and -- is that on a

23    tape?

24            MR. MILLER:  One moment, your Honor.  Your Honor,

25    evidence that -- as I sit here today I don't have evidence

SENTENCING - GRADO

1   that Mr. Tranese asked Mr. Lavuzo to sit down on behalf of

2   him; just that they are closely associated and that the sit

3   down occurred and it was resolved and that they continued to

4   work, he and Mr. Grado continued to work the conspiracy

5   together.  And against the background of how organized crime

6   disputes get resolved, which is more senior members --

7            THE COURT:  What was the dispute?

8            MR. MILLER:  There was a dispute between who would

9   control access to the Doctor's prescription pad.

10           THE COURT:  Between Mr. Tranese and Mr. Grado.

11           MR. MILLER:  Yes, your Honor.

12           THE COURT:  Then you have evidence that Mr. Lavuzo,

13   who is a member of the Colombia family, sat down to resolve

14   this with a member of the Lucchese family.

15           MR. MILLER:  Yes, your Honor.

16           THE COURT:  How was it resolved?

17           MR. MILLER:  It was resolved that Mr. Grado would

18   keep control of the pads, but then they worked together after.

19           THE COURT:  Do you agree, Mr.Aidala, that there was

20   a dispute?

21           MR. AIDALA:  Your Honor, there may have been a

22   dispute between Mr. Grado and the Doctor in this case.  But as

23   we sit here today, Mr. Tranese says he didn't have any

24   disputes.

25           Once again, your Honor, we're not challenging

SENTENCING – GRADO

1    whether this meeting took place and who was at the meeting.

2    He wasn't involved.  Mr. Tranese wasn't involved.  Both sides

3    are in agreement with that he wasn't present, I should say.

4              THE COURT:  Mr. Tranese did you read over your

5    presentence report?

6              MR. TRANESE:  Yes.

7              THE COURT:  Did you have an opportunity to discuss

8    the contents of that report with your counsel.

9              MR. TRANESE:  Yes.

10             THE COURT:  Are you satisfied in how he represented

11   you?

12             MR. TRANESE:  Yes.

13             THE COURT:  The guidelines, the Probation Department

14   has it as total offense level 32, criminal history category

15   one, 121 to 151 months.  The Government agrees with the

16   defendant's position at paragraph 33, that plus three should

17   be removed, correct?

18             MR. MILLER:  Yes, your Honor.

19             THE COURT:  Because he was not a manager or

20   supervisor.  From my review of the facts that seems to be

21   accurate.

22             So the Government believes that the guideline range

23   is 28, criminal history category one, that's arrived at by

24   both eliminating the three points for manager or supervisor

25   and for providing an additional point for global plea.

SENTENCING – GRADO

1    MR. MILLER:  Yes, your Honor.

2    THE COURT:  So 28, which is 78 to 97.

3    MR. MILLER:  That's correct, your Honor.

4    THE COURT:  Do you agree with that, Counsel?

5    MR. AIDALA:  Yes, your Honor.

6    THE COURT:  We have an agreement.  I think both

7    parties agree what the guideline range should be.

8    And the Government's position is with Mr. Tranese

9    there should be a guideline sentence within that --

10   MR. MILLER:  That's correct.

11   THE COURT:  -- range.  Whereas, with respect to

12   Mr. Grado you take the position that it should be 180 months.

13   MR. MILLER:  In excess of 180 months.

14   THE COURT:  In excess.

15   MR. MILLER:  I believe that's what we said.

16   THE COURT:  That's 15 years, correct?

17   MR. MILLER:  Yes, your Honor.

18   THE COURT:  Could the Government talk -- let me

19   proceed now with Mr. Grado.  Is there any reason, Counsel,

20   with respect to Mr. Grado why we should not proceed with

21   sentencing?

22   MR. IANDOLO:  No, your Honor.  He's aware of

23   everything that is going on.

24   THE COURT:  In the presentence report there is an

25   allegation that in addition to Mr. Grado brandishing a gun,

SENTENCING – GRADO

1    that one of his relatives stabbed the Doctor.  Do you want to

2    tell me more about that?

3              MR. MILLER:  Yes, your Honor.  What I can tell you

4    about that is a witness would testify that he had gotten -- a

5    witness would testify that the Doctor had received a new

6    shipment of prescription pads.  And that there was an attempt

7    to hide them from Mr. Grado.  That after Mr. Grado learned

8    about them being hidden from him, the prescription pads being

9    hidden from him, the relative stabbed the Doctor in the rear.

10             THE COURT:  I take it these were not life

11   threatening injuries.

12             MR. MILLER:  That's right, your Honor.

13             MR. IANDOLO:  If I may rebut that?

14             MR. MILLER:  And Mr. Grado was present when that

15   occurred.

16             THE COURT:  Okay.  This is why I asked earlier,

17   Counsel, whether there were challenges, factual challenges, to

18   the report, and you said there weren't.

19             MR. IANDOLO:  I want to rebut that with two things.

20             First being stated that at all relevant times I

21   think the Government will agree, that at the inception of

22   their relationship, Mr. Grado was trying to help the Doctor,

23   because the Doctor had his own drug problems and my client was

24   trying to get him off of --

25             THE COURT:  By stabbing him in the rear?

Case 1:17-cr-00550-GBA   Document 106   Filed 10/20/20   Page 26 of 58 PageID #: 786

1          MR. IANDOLO:  He wasn't at that meeting or that

2     incident.

3          As far as it happening is one thing, and him being

4     there is a second thing.  And whether it was at our direction.

5          THE COURT:  Aren't these things we bring out before

6     we come out here?

7          MR. IANDOLO:  The fact that it happened is not

8     disputed.  The fact that we were there and at our direction --

9          THE COURT:  Isn't that what the report says?  It

10    says, on another occasion when Grado and the Doctor and others

11    were present together inside the office, that one of Grado's

12    relatives stabbed the Doctor when Grado learned that Doctor

13    had hidden the prescription pad.

14          That's right there.

15          MR. IANDOLO:  It doesn't say he was there, maybe at

16    the facility, it does not say he was there.

17          THE COURT:  It says, while Grado, the Doctor and

18    others were present together inside the office, that Grado had

19    established with the Doctor one of Grado's relatives stabbed

20    the Doctor after Grado learned the doctor had hidden the

21    prescription pads from Grado.

22          Am I reading that incorrectly?

23          MR. IANDOLO:  Your Honor, we're going to contest the

24    fact that we were not there at that time.

25          THE COURT:  Why didn't you do that before?

SENTENCING - GRADO

1     MR. IANDOLO:  Sorry, your Honor.

2     THE COURT:  What is the Government's position on

3  this, now that you know it's contested?

4     MR. MILLER:  Your Honor, I think what he's

5  contesting is a very narrow slice of that, which is that he

6  was present.  I think the circumstantial evidence is pretty is

7  overwhelming of why the stabbing would have occurred.  It's a

8  relative in the office of Grado.  I don't know that it

9  matters, certainly doesn't matter for the guidelines

10  calculation as we've talked about already.

11     THE COURT:  But the rest of that paragraph is not

12  contested?  The fact that he was stabbed, I believe that's

13  contested.  It says in eight, same conversation, Grado told

14  the Doctor if the doctor's newly ordered prescription pads go

15  into anybody's hand other than Grado, I'll put a bullet right

16  into your head.

17     He also it says, additionally during the course of

18  the conspiracy on at least one occasion Grado brandished a gun

19  at the Doctor in a threatening manner to reiterate to the

20  Doctor that his prescription pads were under Grado's control.

21     MR. IANDOLO:  That is on taped conversation, so we

22  don't contest that part.

23     THE COURT:  Okay.  Do you want to be heard?

24     MR. IANDOLO:  Yes, your Honor.

25     Your Honor, if we may, at the direction of my client

SENTENCING – GRADO

1    we're going to be short and to the point.  Before this Court

2    sentences Mr. Grado we ask that you take into account all the

3    standards of the 3553 which are laid out in our papers.

4          Throughout the time Mr. Grado, and it's laid out,

5    that Mr. Grado has substantial health problems, cellulitis and

6    his diabetes which are could be life threatening, his legs are

7    in very poor shape, discolored, and he needs severe medical

8    attention.

9          In the courtroom is his whole family besides his

10   mother.  His mom has a fear of traveling, it's a serious

11   phobia she's being treated for.  His father stands in this

12   court, with Mr. Grado's daughter, Mr. Grado's ex-wife, and a

13   few of his other friends and colleagues.

14         Mr. Grado wants the Court to know that when you

15   sentence him that you have leniency on them, and not him.  He

16   stands before the Court understanding what he has done and

17   what he has done is wrong.  He has while he was in holding he

18   went to, he completed, a program, the Focus Forward program.

19   Mr. Joe Putnam is sitting here in support of Mr. Grado's

20   completion of that program.  The program had drafted a letter,

21   which was attached to my supplemental of November 20, it's

22   actually touching how it was written.  Mr. Grado often lends a

23   hand where he is, the same way he tries to lend a hand in this

24   case.

25         Taking all of those small instances into account,

SENTENCING - GRADO

1  Mr. Grado truly only asks that this Court sees that his family

2  is going to be void of a lot of joyous occasions and he's

3  asking that you take leniency on them.  We ask that you depart

4  even further from the Government's seeking 180 months, which

5  is 15 years; closer to 98-month mark, only for the mere fact,

6  once again, Mr. Grado's health is not good shape.  Anything

7  longer than that could be a death sentence to Mr. Grado.

8  Thank you.

9         THE COURT:  Before I hear from Mr. Grado does the

10 Government want to add anything to their letter?

11        MR. MILLER:  Yes, your Honor briefly.  I think what

12 you have here is a dangerous mixture of extremely dangerous

13 drugs, a large number of extremely dangerous drugs, credible

14 threats of violence, and a scheme that is backed up by the

15 defendant's membership in the Lucchese crime family.  It is

16 the end, or the latest instances I should say, in a history of

17 criminal activity involving the defendant including very

18 serious charges in this Court in the past.

19        THE COURT:  Let me ask you about his criminal

20 history.  There were very serious charges in 1994, but a lot

21 of the more recent criminal history category for which he got

22 a significant number of points were shoplifting, larceny, they

23 weren't crimes similar to the one that was very serious, I

24 grant you, back in '94.

25        MR. MILLER:  That's very true, your Honor.  There

30

SENTENCING - GRADO

1    are a number of convictions for low-level, relatively

2    low-level crimes misdemeanors.  But, one, there is a

3    significant number of them.  And two, for a very long time he

4    was running a sophisticated oxycodone distribution

5    organization.  As you can see from our letter, there are some

6    incredibly chilling threats of violence where the defendant

7    threatened to put a bullet in people's heads, threaten to put

8    a bullet in the Doctor's head, threaten to put a bullet in

9    Larry's head, I submit to you that is Larry Tranese.

10        I don't think that you should infer from the fact

11   that he only has a number of misdemeanor convictions that he

12   has changed his stripes.  Certainly during the time period of

13   the offenses that are happening here, he was both selling

14   large amounts of dangerous dugs, utilizing the resources of

15   organized crime, and engaging in, if not actual violence,

16   extremely credible threats of violence.  I know, your Honor,

17   had the opportunity to hear the recordings that were submitted

18   with our letter.

19        With respect to the defendant's family, any sentence

20   has an effect on a defendant's family.

21        As we note in our letter, the defendant involved

22   members of his family in his oxycodone distribution scheme,

23   both the defendant's father and the defendant's ex-wife.  And

24   so it, of course, will have an impact on them going forward.

25   I don't think that that is something that could have been

SENTENCING - GRADO

1   thought of ahead of time.

2          For those reasons, we think that a significant

3   sentence is appropriate.  The sentence we are asking for is a

4   term of imprisonment in excess of 180 months; that is

5   50 percent discount from the low end of the guideline range.

6   And we think that is sufficient but not greater than necessary

7   in this case.

8          MR. IANDOLO:  May I?

9          THE COURT:  Yes.

10          MR. IANDOLO:  Two things.  First, I want to point

11   out Mr. Grado's age.  Obviously he's an elderly man, he's not

12   a young guy.

13          THE COURT:  He's elderly?

14          MR. IANDOLO:  He's 55 years old.

15          THE COURT:  Don't make me feel bad.

16          MR. IANDOLO:  I don't mean that by any means.

17          Anything more than 98 months he's going to come out

18   even more older than he already is.  His father, that counsel

19   speaks of, is in his later years as well.  Mr. Grado only has

20   one wish, that he actually come out and see his father when he

21   comes out.  He's not looking to go back into the life of crime

22   when he comes out.

23          Secondly is the fact that his -- as far as to his

24   ex-wife, he wants to clarify, at no time was she involved in

25   anything of that sort.  He only states he was trying to get

SENTENCING - GRADO

1    her a legitimate job -- to get the doctor to work with him.

2              THE COURT:  Mr. Grado, did you want to the say

3    anything before the Court sentences you?

4              MR. GRADO:  No, your Honor.

5              THE COURT:  You could speak if you would like to.

6              MR. GRADO:  I'm good.  Thank you.

7              THE COURT:  All right.  I have read over the

8    presentence report, considered the sentencing submission by

9    both the Government and defense counsel, and considered the

10   3553 factors.  The guideline range here, which is 360 to life,

11   I think is excessive and the Government has recognized that as

12   well.  Even though this is an extraordinarily serious matter,

13   still those type of guidelines don't seem appropriate and are

14   not consistent with the dictates of 3553.

15             Let me just review some of the factors in the

16   guidelines.  One is the seriousness of the offense and the

17   need to promote respect for the law.  As we read in the papers

18   every day, the drug that was involved here is an

19   extraordinarily dangerous drug.  And has resulted in

20   wide-spread addiction and death; I'm not saying death are

21   linked to the drugs the defendant sold.  But it's a very, very

22   serious offense.  There were I think over, if I'm correct,

23   over 4,000 grams of oxycodone involved in this case.  So it's

24   a very serious offense.

25             It was accompanied by violence, that hasn't been

SENTENCING – GRADO

1    disputed, that the defendant himself brandished a gun,

2    relatives of his even, if Mr. Grado weren't present, assaulted

3    the doctor.  That's another very negative factor.

4              The sentence has to promote respect for the law,

5    provide just punishment, serve as a deterrent.  I think there

6    is a necessity for a deterrent feature here.  Mr. Grado does

7    have a long history of criminal activity.  Although I have to

8    say that I do believe that a criminal history category six,

9    which is accurate, really does overstate his particular

10   criminal history category, but nonetheless he has consistently

11   engaged in criminal conduct.  So there is a deterrent feature

12   here to be served.

13             As always, the concept of general deterrence.

14             I've considered the history and characters of the

15   defendant.  As the Government points out, it's not disputed

16   here, that he's a member of organized crime.  I recognize when

17   considering the history and characteristics of the defendant

18   that there are health issues here that should be considered by

19   the Court.

20             Having considered all of the factors I think that

21   the sentence that the Court is intends to impose is one that

22   is substantial, not as substantial as that sought by the

23   Government, but we have a defendant here although he engaged

24   in serious criminal conduct, has admitted to the conduct.

25             I'm going to sentence the defendant to the custody

1   of the Bureau of Prisons for 144 months to be followed by a

2   three-year term of supervised release.  I will impose a

3   special assessment of $100.  I won't further impose a fine.

4   It's not clear on anything that's been presented that he can

5   pay a fine.

6           I'll make it a condition of his supervised release

7   that he abstain from using drugs and that he not have contact

8   with victim here, I'm referring to the victim as the doctor.

9   I don't know that he's a victim in the sense of the fact that

10  he was not involved, if anything he was a co-conspirator, but

11  there were threats made to him and to the extent that he's a

12  victim in that sense I'll prohibit any contact with him.

13          Mr. Grado, I think the sentence the Court imposed,

14  you've given up your right to appeal, your right to appeal

15  sentence, any notice of appeal has to be filed within 14 days.

16  Do you understand that?

17          MR. GRADO:  Yes.

18          THE COURT:  Is there anything I overlooked from the

19  Government's perspective?

20          MR. MILLER:  I handed up the forfeiture order.

21          THE COURT:  Is there any reason not to sign the

22  forfeiture order?

23          MR. IANDOLO:  No.

24          THE COURT:  Is there anything that I've overlooked

25  from --

SENTENCING – TRANESE

1           MR. IANDOLO:  No, your Honor.

2           THE COURT:  I don't know if it's helpful for the

3    Marshals for Mr. Grado to leave.

4           THE MARSHAL:  Yes, we'll leave.

5           THE COURT:  Mr. Aidala, any reason that we should

6    not proceed with sentencing with regard to Mr. Tranese?

7           MR. MILLER:  No, your Honor.

8           THE COURT:  You want to be heard?

9           MR. MILLER:  Yes, your Honor.  Your Honor, I was

10   considering when I was reading all of these documents

11   preparing for today, what brings a 55-year-old man before the

12   Court today who has no criminal record.  And sometimes the

13   answer is, well, he scooted through without getting caught.

14   That's not the case here.

15          As the Court knows, Mr. Tranese has worked at Hunts

16   Point Market for basically his entire adult life.  As the

17   Court well knows, that is an area that is regulated and

18   constantly investigated by the federal, state and city

19   authorities.  In the course of his employment he's never had

20   any issues with law enforcement that have resulted in a

21   conviction.  So here is a man who is, he's not a criminal,

22   right.  Usually, your Honor --

23          THE COURT:  Well, he is now.

24          MR. AIDALA:  I mean prior to this case.

25          So what usually brings people before the Court?

SENTENCING - TRANESE

1   Sometimes it's straight-up greed.  Sometimes it's laziness;

2   doing the right thing is usually harder than doing the wrong

3   thing.  Sometimes it's a person that has a pension for

4   criminality.  I don't think those are the driving factors, any

5   one of those are the driving factor, of what brought us here

6   today.  I think the driving factor of what brought us here

7   today is addiction.

8           I'm not going to stand here, your Honor, and blame

9   anybody else for what Mr. Tranese did.  He's here to accept

10  responsibility for what he did.  It would be easy from a

11  defense attorney's point of view to point fingers at before

12  Grado and the doctor, that's not my intention.

13          THE COURT:  By the way, excuse me, what happened to

14  the doctor?  The Government didn't indict the doctor?

15          MR. MILLER:  He's not charged in this case, your

16  Honor.

17          THE COURT:  Okay.

18          MR. AIDALA:  He's not charged, your Honor, but he's

19  the person who got this whole thing started.

20          THE COURT:  Arguably, Mr. Grado got it started.

21          MR. AIDALA:  If you want to back up before that to

22  show you what really what happened, is Mr. Tranese is in

23  horrible health, one of his issues has to do with his

24  diabetes.  One of the issues that the diabetes has, one of the

25  ailments, affects his feet.

SENTENCING - TRANESE

1          If there is any issue about that, your Honor, in my

2    career this is the first time I've ever seen a defendant

3    wearing his monitoring device on his wrist, not his ankle.  It

4    was determined his feet are so sensitive and delicate that the

5    monitoring device could cause an infection to his feet;

6    thereby, having his foot amputated.  There is no issue as to

7    whether he's got these type of medical problems.

8          So he reaches out to a doctor who he's under the

9    impression is a reputable doctor who deals with feet and feet

10   ailments.  The issue, your Honor, is that Mr. Tranese's feet

11   are so bad at this particular time, he can't put on a shoe,

12   right.  He can't even go to work.

13         There is a combination of health ailments that are

14   now bleeding into economic ailments because the job that he

15   does really entails him being there.  He has to go to the

16   fruit market.  He has to pick out the right fruit, the right

17   vegetables, then negotiate sometimes for pennies on the

18   dollar, that's where the profit margin is.  He was unable to

19   do that at that time because he was in such bad shape

20   physically.  He was already, your Honor, prescribed Percocet.

21   He was already by another doctor prescribed Percocet.  The

22   doctor in this case was supposed to come over and simply rub

23   some medical cream that only a doctor can prescribe onto his

24   feet and massage his feet in a certain way and help with these

25   big sores on his feet.  And the doctor in fact did that.  But

SENTENCING – TRANESE

1   he also, your Honor, prescribed him oxycodone.  Right there,

2   right then, their first meeting knowing that he was already on

3   Percocet.  And the oxycodone now provides Mr. Tranese with the

4   physical relief that he had been seeking.  He gets addicted to

5   it.  And, your Honor, just alluded moments ago to how

6   dangerous these drugs are.  The Government in their submission

7   used the statistics of how significant the drug addiction is,

8   how the loss of life has been impacted.  They use that as a

9   sword, but we're using it a shield.

10          A 55-year-old man, at the time 52 or 51, who's been

11  a hard-working person his whole life doesn't turn to a life of

12  crime for no reason whatsoever, at least not in this case.  He

13  got addicted to drugs.  A drug that is very well known

14  nationally to be very addictive.

15          Besides Mr. Tranese accepting responsibility, if

16  there is some blame to go around for the genesis of this whole

17  thing, it has to do with the doctor who was giving out

18  oxycodone like they were jelly beans, wasn't monitoring it,

19  wasn't saying, 'Mr. Tranese, I'm only going to give you ten

20  for the whole week, one-and-a-half a day, meter it out on top

21  of the Percocet that I already know you're taking.'.

22          Your Honor, there are other courthouses in this

23  jurisdiction that I would be going in on this case arguing for

24  a drug treatment program.  I was blessed enough to be in the

25  Brooklyn District Attorney's Office in the early 1990s when

SENTENCING - TRANESE

1    the first drug treatment programs entered the atmosphere in

2    the world of criminal law.  They were unique.  And sometimes

3    District Attorney Joe Hynes was viewed as being soft on crime

4    because he allowed people to go to drug treatment as opposed

5    to warehousing them in a jail.  And now 30 years later every

6    courthouse in America has some sort of a drug treatment

7    program, because it's been acknowledged the addiction to these

8    drugs is so significant that it makes good people do bad

9    things.  And this particular drug, which is given out by

10   doctors, no one is saying Mr. Tranese went on the corner and

11   bought cocaine or bought marijuana or bought heroin.  It's a

12   drug that he's prescribed from a doctor, as many of these

13   people start their addiction with, and then it just takes

14   over.

15           And now there is an element of, I wouldn't say

16   greed, your Honor, but survivalist.  Because now he's in debt,

17   with a mortgage on his house about to go into foreclosure.  He

18   and the doctor become friends.  The doctor is in a horrible

19   position, he's going through a divorce, I'm not 100 percent

20   sure I think he's eating the pills himself.  They become

21   buddies.  He has no where to live.  The doctor has no where to

22   live.  Mr. Tranese says, you can become my roommate, stay

23   here.  Not for any nefarious reasons.  He already had the

24   pills, he needed he didn't need to let him sleep in the house

25   to get the pills, but that's who Larry is.  He's, 'My door is

SENTENCING – TRANESE

1    always open.  There is always some food in the refrigerator

2    for everybody.'  And the relationship continues.

3          And he wounds up being a tenant downstairs to a

4    legitimate apartment that Mr. Tranese had rented out in the

5    past.  Where Mr. Tranese's big crime, I use crime in

6    parentheses, takes place is when he connects Mr. Tranese (sic)

7    to Mr. Grado.  Although we have information that they may have

8    known each other, or may have been acquaintances, he

9    introduced the two of them.  And I submit, your Honor, not to

10   commit a crime, not to start any big conspiracy.  It was just

11   a social kind of interaction, which then took on a life all of

12   its own that Mr. Tranese had nothing to do with.

13         They were going out partying.  They were drinking.

14   They were smoking.  They were doing whatever they were doing.

15         Larry was home, still trying to run his business

16   with his son, Luis, and other people who worked for him.  He

17   wasn't part of the party scene.  Even if he wanted to be, his

18   health issues would never had allowed that to happen.

19         Did Mr. Tranese make some money off of these

20   transactions?  Yes, he did, your Honor.  Did he use that money

21   to pay bills for his house?  Yes, he did, your Honor.  There

22   are no fancy cars, fancy watches, extravagant trips.  There

23   was money that was used to survive.  Has he paid that money

24   back?  Yes, he has, your Honor.  He paid that money back, the

25   agreed upon amount, to the Government.

SENTENCING – TRANESE

1          Even when this particular enterprise ended, which

2    was in 2012, he doesn't pursue any other criminality.

3          He's still addicted to his pills.  He finds other

4    ways to get the pills, majority of them legally.  Because he's

5    addicted, he needs to eat these things to sleep, to walk, to

6    live.  And but he gets back on his feet to a degree at the

7    Hunts Point Market and he's able to survive.  His son helps

8    him out.  His daughter, Erica, helps him out.

9          It would have been so much easier, your Honor.  The

10   life in the Hunts Point Market is not an easy life.  You to

11   get there middle of the night, two, three in the morning.

12   You're grabbing from cantaloupe to romaine lettuce, you know

13   the dangers of all this stuff.  You have to negotiate then,

14   bring it to the stands and stores that are selling it.  By the

15   time you're going to bed it's two, three in the afternoon.

16         Even though he was making easy money, quote/unquote,

17   with the pills, once that came to an end he didn't go back to

18   it.  He ended it himself and went back to the hard work.  Also

19   his feet actually got a little better, and he was able to do

20   so.  That is not the profile of someone who is a member of

21   organized crime, your Honor.

22         THE COURT:  I don't think anyone says he was a

23   member of organized crime.

24         MR. AIDALA:  They don't use the word member.

25         THE COURT:  Associate.

SENTENCING - TRANESE

1      MR. AIDALA:  I don't know what the word associate

2  means.

3      THE COURT:  It means you've got friends.

4      MR. AIDALA:  If the Court wants to know about how

5  the Government views Mr. Tranese, when Mr. Lavuzo, who the

6  Court referred to earlier, when he was released from jail he

7  was given a list of everyone he could not associate with

8  because they were members of organized crime.

9      THE COURT:  It's not alleged here that Mr. Tranese

10 is a member of organized crime.  There is the allegation that

11 he was associated with this fellow who was and called him in

12 to help him.  The Government doesn't contend he's a member of

13 organized crime.

14     MR. MILLER:  No, your Honor.

15     THE COURT:  We don't need to go there.

16     MR. AIDALA:  My point is, without belaboring it and

17 it's not to belabor it, you have a person here who grew up in

18 Bensonhurst, Brooklyn, in the height of the world of organized

19 crime.  If that was who he was then, he would have gone down

20 that road.  And opportunity, after opportunity, after

21 opportunity, he turned it down.

22     My bottom line point is, when the Court is

23 determining his sentence, I sincerely hope that the Court is

24 not factoring in the fact that unbeknownst to him a guy on the

25 block who he became friendly with at eight or nine years old,

SENTENCING – TRANESE

1   and maintained a relationship with, who my understanding was a

2   legitimate member of society until late in life, Mr.  Lavuzo

3   went in that direction, much later in life, then went to

4   prison, then came back.  And because Mr.  Lavuzo wasn't

5   allowed to hang out with everyone he was hanging out with, he

6   latched on with Mr. Tranese because he was allowed to hang out

7   with him.  That's their big association.  It's not they are

8   associating because they are committing crimes together.  So

9   please, your Honor, keep that in the front of your mind.

10          That ties into the threats.  We're adamant that no

11  slapping took place.  There may have been fights between,

12  arguments, between two basically strangers living under the

13  same roof, only because Mr. Tranese was nice enough to allow

14  him, the doctor, to live there when he was homeless, yes.  Did

15  he threaten him or were there implied threats?  Yes, your

16  Honor.  But not the type of implied threats that this Court is

17  used to hearing regarding organized crime.  Not the type of

18  threats that this Court heard moments ago regarding Mr. Grado,

19  and shooting people in the head.  And the person that would be

20  shot in the head is Mr. Tranese, because Mr. Tranese was a

21  tiny part of this big conspiracy.

22          When you look at the dollars involved and the volume

23  involved, not only do we disagree with the presentence report

24  that there should a three-level enhancement for a role; we

25  think there should be a reduction for his role.

SENTENCING - TRANESE

1          THE COURT:  He's only being held accountable for the

2     amount of drugs that he dealt with.  So I think you could

3     argue that maybe there would be a reduction in role if the

4     Government were seeking to hold him accountable for all of

5     Mr. Grado's drugs, but they are not.  They are seeking to hold

6     him accountable for what he did.  I don't see the argument

7     that there is any reduction.

8          MR. AIDALA:  I'm only stating that in light of the

9     overarching -- I agree that the Government was reasonable in

10    their determination and that's why we were on the same page

11    regarding his role.

12         I'm saying, if you look at it at a macro point of

13    view of what really Mr. Grado did and what he was involved in

14    and, what the doctor did, and what a small piece Mr. Tranese

15    has, he has a very small piece of that big picture.  That's my

16    only point, your Honor.

17         Basically, as I said, his biggest crime,

18    Mr. Tranese, was connecting those people.

19         Just so the Court knows, that's not my opinion.  My

20    understanding is when they initially got the eavesdropping

21    warrant, my client's name is not even mentioned in the

22    application to the judge.  It has to do with Mr. Grado and

23    another individual who is not Mr. Tranese.  Even from the

24    beginning, the Government's position is that Mr. Tranese is

25    not a compelling force in what is going on.

SENTENCING - TRANESE

1          So, your Honor, I guess my closing point is this, he

2    didn't commit this crime because he was lazy.  He didn't

3    commit this crime because he wants to be involved in a

4    criminal life.  He committed this crime because he's addicted

5    to drugs, that's why.

6          If he was someone who was going to be committing

7    crimes, he had so many opportunities before and after when

8    this ended, he could have figured out a way to get back into

9    it, but he didn't.  He's an addict.  To this day he's right

10   now, he's popping these pills like they are cotton candy.

11         Is he remorseful?  Yes, your Honor.  You know why

12   he's remorseful?  His own brother, his best friend, died of

13   drug addiction.  When he was in the throws of feeding his own

14   addiction he wasn't thinking of the harm he was doing to

15   everybody else.  But then when he steps back and the good

16   judgment he used for the first 50 years of his life comes back

17   into his brain, he realizes that he lost his best friend to

18   drugs and now he was part of the story that hurt other people

19   for drugs, because of their use of drugs or abuse of drugs.

20   So yes, your Honor, he is remorseful.

21         Deterrence, your Honor, this whole experience has

22   been a deterrence.  His son, Luis, his daughter, Erica, in the

23   second row, who now live with him to help him both financially

24   and with his medical problems, that's his deterrence.

25         But, your Honor, I didn't argue or put officially in

Case 1:17-cr-00559-GBA    Document 106    Filed 10/20/20    Page 46 of 58 PageID #: 806

1   my papers abhorrent behavior, if you look at his life at a

2   whole, this is not who he is.  The need for deterrence, unlike

3   Mr. Grado who has a lot of criminal context, that's not

4   Mr. Tranese.

5          Incapacity.  Your Honor, he's already incapacitated.

6   He is almost 400 pounds.  I'm not going to bore the Court.

7   The doctors say he's a ticking time bomb.  He just had an

8   operation in April.  They want him to have the gastric bypass

9   because you can't live -- his parents died of the same type of

10  diseases, heart disease and stroke and high blood pressure

11  high cholesterol.  He's a physical mess.

12         In terms of him hurting somebody else, we don't have

13  to worry about that.

14         Rehabilitation.  Your Honor, boy does he need

15  rehabilitation.  That's what I'm asking for on behalf of

16  Mr. Tranese, is rehabilitation, physically, both from a mental

17  stand point, from a physical medical stand point, but most

18  importantly, from an addiction stand point.  We got to get him

19  off of these drugs somehow or another.  He goes to pain

20  management on a regular basis.  I lost track of how many times

21  a week.  We got to get him off the drugs, that's what brought

22  him here.

23         The letters that we feature in our submission, your

24  Honor, to know Larry is to love him.  That's the truth.  I can

25  speak personally, your Honor, myself, Mr. Jack Reno, for the

SENTENCING - TRANESE

1    staff of my office, we love when Mr. Tranese comes in.  He

2    lights up the room with his positive energy, with his smile.

3    He knows that this is a nightmare for him for his family, but

4    he's a good guy.  He's a nice guy.  He's a happy-go-lucky

5    family man who lives for his family.

6              Your Honor, the Court does have the power to take

7    his health into consideration when you're determining his

8    sentence.  That's our submission on page 14.

9              I'm not going to go through every disease and

10   everything he has, but the record should indicate that

11   Mr. Tranese is wearing his monitoring device on his wrist not

12   on his ankle like everyone else does because the doctors, and

13   I guess the Government, agreed that that would not be in his

14   best interest because of his medical illnesses.  The Court has

15   in your records the fact that he was operated on in March --

16   in April of this particular year.  I would ask the Court to

17   please put that in the front of the Court's mind.

18             Your Honor, I'm not -- I know, and Mr. Tranese

19   knows, he needs to be punished.  I'm asking the Court to

20   sentence Mr. Tranese to 24 months.  And to ask that he be

21   admitted to the residential drug treatment program.  He'll be

22   confined, he'll be punished, away from his family, away from

23   his business.  But this is the federal Government's program to

24   help people like Mr. Tranese who needs help.

25             It's no secret, your Honor.  In the Court's file is

SENTENCING – TRANESE

1    his blood work, that shows he's currently addicted to opioids.

2            Your Honor, in the Court's discretion I ask that

3    Mr. Tranese remain at liberty for whatever the Court finds an

4    appropriate time for him to self-surrender so he can take care

5    of his affairs with his children and business.  I would ask

6    that the Court to ask the Bureau of Prisons to house him in a

7    unit that, number one, can tend to his medical needs; number

8    two, is close enough so his family can go and see him.  More

9    than anything else, your Honor, I think justice dictates this

10   addict needs help and the federal Government has designated a

11   residential treatment program as a place to get this help.

12           Thank you for hearing me out.

13           THE COURT:  Before I hear from Mr. Tranese, does the

14   Government want to be heard?

15           MR. MILLER:  Yes, your Honor.  To hear Mr. Aidala

16   tell the story, all Larry Tranese did was get addicted to

17   drugs and then associate with other people who are selling

18   drugs.  And that's not what happened.  Those things are true,

19   he was addicted to drugs, but he was a running a drug

20   distribution conspiracy, or he was at least a player in that

21   conspiracy.

22           All he did was perpetuate the evils that he's

23   suffering under onto other people who are in his community.

24   He made it easy for other people to be suffering from the same

25   things that he's suffering from.  He brought patients to the

SENTENCING - TRANESE

1    doctor.  He took the pads from the doctor.  He received

2    prescriptions as payment from the doctor.  He was working not

3    just with the doctor but also with Anthony Grado to sell these

4    drugs on the street to make money.

5            Was he taking some for himself, probably.  But he

6    was using it as a source of income.  And he backed up the work

7    with threats, as you have heard and seen in our submissions.

8            So the idea that this can all be blamed on other

9    people I think is not right.  If all that had happened is

10   Mr. Tranese was an addict who got pills illegally this way for

11   himself, I don't know that he'd be sitting here.  I don't

12   know -- I don't think that he would have pled guilty.

13           Just to give you a sense of it, your Honor, he has

14   stipulated that he's accountable for 150 grams of oxycodone,

15   for the distribution of 150 grams of oxycodone.  That's

16   significantly less than the quantity that Anthony Grado was

17   accountable for.  They are differently culpable.  But

18   oxycodone pills come in different amounts.  They come often in

19   30-milligram amounts, or 15-milligram amounts.  30-milligrams

20   of oxycodone is -- 150 grams of oxycodone is 5,000

21   30-milligram pills.  It's 10,000 15-milligram pills.  So we're

22   not talking about a small amount of a very dangerous drug.

23   It's a significant amount of that drug.

24           I think it's clear that Mr. Tranese is differently

25   situated from Mr. Grado in another significant way, which is

SENTENCING - TRANESE

1    his criminal history.  His criminal history is adequately

2    reflected in the guidelines.  It's category one, he has no

3    prior arrests.  And so I don't know that he needs another

4    further reduction for not previously committed crimes beyond

5    what is in the guideline range.

6            And on the organized crime association, which I

7    think is -- whether he is or isn't an associate of organized

8    crime, he certainly was associated with it, in the sense that

9    this entire scheme is an organized crime-backed scheme and

10   members of organized crime helped him in resolving a dispute.

11           So for all of those reasons we think that a

12   guidelines sentence is appropriate here.  It's 78 to 98

13   months' imprisonment.  We think that is sufficient but not

14   greater than necessary.

15           THE COURT:  Even with the distinction between he and

16   Mr. Grado?

17           MR. MILLER:  Yes, your Honor.

18           MR. AIDALA:  Your Honor, may I say one more thing?

19           THE COURT:  Yes.

20           MR. AIDALA:  I just I found out just moments ago

21   because of your question the doctor in this case, who is the

22   one who is actually supplying all the drugs and doesn't even

23   get charged, your Honor.  So the Government, that's their

24   position, I'd ask the Court to keep in mind that the person

25   who is actually feeding his addiction and giving him the means

SENTENCING - TRANESE

1  to have this crime take place doesn't even get charged with

2  anything.  So ostensibly that person is still a doctor, there

3  is no felony that is going to knock the doctor off his or her

4  perch.  Thank you, your Honor.

5          THE COURT:  Mr. Tranese, do you want to say anything

6  before the Court imposes sentence?

7          MR. TRANESE:  Yes, I do, your Honor.  I would like

8  to thank you for the opportunity to talk today.

9          I'd like to start by saying that words can't

10  properly express my regret regarding what has transpired.

11  Though I may not have realized the magnitude of my acts at the

12  time, I now understand how damaging my role in the case was.

13          I never would have imagined me standing here

14  defending my character, begging for leniency.  I never

15  pictured the FBI showing up to my house and taking me away.

16          Your Honor, I've worked my whole life.  In many

17  humbling professions.

18          Excuse me.

19          I was never one to take the easy road.  Seeing the

20  news connecting me to organized crime really broke my heart.

21  My entire life I had opportunities to get involved and chose

22  not to.  My father always taught me that was a tough guy, who

23  gets up and goes to work, and that's exactly what I've done.

24  I worked from 2:00 a.m. to 8:00 p.m., six, seven days a week

25  for 30 years.  And I find myself in this position.

SENTENCING - TRANESE

1          I don't mean to minimize the severity of what has

2   happened and what I've done, only impress my wrongdoings were

3   uncharacteristic and not indicative of who I am as a person.

4   Not with the intent or malicious.

5          I was introduced to the foot doctor to help treat a

6   legitimate medical issue caused by my diabetes.  After a few

7   months of treatment and being prescribed these pain killers

8   that provided significant relief, I became dependent on the

9   drugs.  A doctor-patient relationship became more of a friend

10  relationship.  And the drug dependency became even more

11  accessible.  With that accessibility came poor and poorer

12  judgment that led me to the mistakes I made that I'll regret

13  for the rest of my life.

14         I now see the immense dangers of opioid addiction.

15  Like what Mr. Aidala said earlier, I lost a brother to

16  addiction.  I feel terrible that I played a part in helping

17  these things get out into the community.  I'm extremely

18  embarrassed from my actions.  I've always tried to be a good

19  role model.  And instill good work ethic into my children.

20         This is very hard for me, your Honor.  I am

21  heartbroken to have them see me like this today.

22         I realized that I'm going to be punished for my

23  actions.  I just hope you know that's not who I am, who I've

24  been and who I am as a person is taken into account and will

25  determine my punishment.  I'm asking the Court for a lenient

SENTENCING – TRANESE

1  sentence.  And I can't put into words how sorry I am, sorry to

2  the community, to people who may have been affected, sorry to

3  my kids, to my family, to the Court, and sorry to myself.

4          The last 15 months have been full of much reflection

5  and remorse.  I know that there isn't anything I can do or

6  undo to undo my mistakes I've made, except to learn from them

7  and to do my best to become a better person to positively

8  influence the people around me and make amends wherever I can.

9          I know that jail time is inevitable, but I am

10  looking forward to working on myself so I can rejoin society

11  and make the most positive impact I can.

12          Thank you, your Honor.  Thank you to the Court for

13  taking the time to hear me.  This whole experience has been a

14  nightmare.

15          Your Honor, I just want the Court to know that I've

16  never been involved in organized crime.  These people that I

17  grew up with, a lot of friends, a lot of acquaintances, I

18  could have gone down that road plenty of times and never did.

19  I always chose to go to work.  I just hope the Court

20  understands that that's who I am.

21          Thank you for your time.

22          THE COURT:  All right.  I certainly reviewed the

23  sentencing submissions here, taken into account presentations

24  made by counsel and the Government.

25          The guidelines here would provide for a minimum

SENTENCING – TRANESE

1    sentence of 78 months, but the Court has to fashion a sentence

2    with the guidelines in mind but also with the 3553(a) factors

3    in mind.

4            The distribution of oxycodone is a very serious

5    crime.  The defendant here was obviously far less involved

6    than his co-defendant, but nonetheless the Government points

7    out there was a significant amount of oxycodone that this

8    defendant is responsible for.  So the sentence has to reflect

9    the seriousness of the crime and promote respect for the law.

10           I do as well find that there was behavior on

11   Mr. Tranese's part that was meant to be at the very least

12   intimidating.  I think that is reflected by the conversations

13   that have been submitted to the Court.  So these are

14   significant factors.

15           On the other hand, this defendant stands in a

16   different position than his co-defendant when you consider his

17   history and characteristics.  He is someone that apparently

18   has worked all his life prior to this.  He has a good work

19   history.  He has a family.  And he has significant health

20   concerns.  These are factors the Court has also taken into

21   account.

22           There has been a lot of discussion about organized

23   crime here, the Court is not considering Mr. Tranese as any

24   member of organized crime.  But as the Government points out,

25   this was a scenario, a conspiracy, that was led by organized

SENTENCING – TRANESE

1  crime.  It would be, I think, it's strange futility that

2  Mr. Tranese did not know the type of people that he was

3  dealing with in this conspiracy.  But that in turn doesn't

4  make him a member of organized crime, nor does it in any way

5  undermine his claim that he has had legitimate work history.

6        This is obviously, as all sentences are, a difficult

7  sentence to impose.  But the sentence does have to reflect, as

8  I said earlier, the very serious nature of dealing in these

9  types of drugs, and the defendant was clearly involved in

10 that.

11       Having taken all of this into account I'm going to

12 sentence the defendant to the custody of the Bureau of Prisons

13 for a period of 40 months, to be followed by a three-year term

14 of supervised release.

15       I'll impose a special assessment of $100.  I won't

16 further impose a fine, I don't believe he now has the ability

17 to pay any fine.

18       I'm going to make a condition of his supervised

19 release that he not have contact with the victim, I'm

20 referring to the victim as the doctor in this case, or with

21 members of organized crime.

22       I'm also going to make it a condition of his

23 supervision that he participate in either in-patient or

24 out-patient drug treatment as directed by the Probation

25 Department.  I believe under the terms of his agreement with

SENTENCING - TRANESE

1  the Government he waived his right to appeal; is that correct?

2         MR. AIDALA:  Yes, your Honor.

3         THE COURT:  Mr. Tranese, I believe under the terms

4  of your plea agreement you waived your right to appeal the

5  sentence the Court imposed.  If for any reason you believe I'm

6  incorrect, that any notice of appeal would have to be filed

7  within 14 days.  Do you understand that?

8         THE WITNESS:  Yes.

9         THE COURT:  I'll make a recommendation -- he wants

10 to self-surrender.  I take it the Government doesn't object to

11 that?

12        MR. MILLER:  No, your Honor.

13        THE COURT:  You need a date about ten weeks from

14 now.  I'll also recommend he be incarcerated in an institution

15 that can deal with his health issues.

16        COURTROOM DEPUTY:  February 21.

17        THE COURT:  I'll direct, Mr. Tranese, that you

18 surrender yourself to the designated institution.  Your

19 counsel will tell you what institution has been designated on

20 February 21.  Do you understand that?

21        MR. TRANESE:  Yes.

22        THE COURT:  It's a condition of your release, you

23 got to understand that you got to appear.  If you don't show

24 up at that prison facility, the Government will ask for a

25 warrant for your arrest and you can be charged with another

57

SENTENCING – TRANESE

1    offense called bail jumping.  Do you understand that?

2              MR. TRANESE:  Yes.

3              THE COURT:  Is there anything further?  Are there

4    outstanding counts?

5              MR. MILLER:  There are, your Honor, for both

6    defendants.  We'll move to dismiss the outstanding counts here

7    and file a letter.

8              THE COURT:  And the outstanding is everything except

9    Count One?

10             MR. MILLER:  Yes.

11             THE COURT:  Then I'll grant the application to

12   dismiss the counts with the exception of Count One.

13             Then there is a forfeiture order that you want the

14   Court to sign.

15             Any reason the Court should not sign that?

16             MR. AIDALA:  No, your Honor.

17             THE COURT:  I'll sign that.  Anything further from

18   the Government's perspective?

19             MR. MILLER:  No.

20             THE COURT:  Anything further, Mr. Aidala?

21             MR. AIDALA:  Yes, your Honor.  My limited

22   understanding of the residential abuse treatment program is he

23   would not be eligible unless the Court puts on the record that

24   if he is eligible he should be allowed to be enrolled in that.

25             THE COURT:  Government have any reason to doubt his

SENTENCING - TRANESE

1    addiction to drugs?

2            MR. MILLER:  No, your Honor.

3            THE COURT:  I'll make a recommendation that if he's

4    found eligible for that program, that he be admitted to the

5    program.

6            MR. AIDALA:  Thank you very, very much, your Honor.

7            MR. MILLER:  Your Honor, I believe you have my copy

8    of the plea agreement.

9            THE COURT:  Yes.

10           (Whereupon, the matter was concluded.)

11              *      *      *      *      *

12   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

13

14

     Rivka Teich, CSR RPR RMR FCRR
15   Official Court Reporter
     Eastern District of New York

16

17

18

19

20

21

22

23

24

25